Dorris E. NYE, Individually and as Administratrix *Ad Prosequendum* of the Estate of Charles W. Nye, Deceased, et al., Appellees-Appellants,

v.

A/S D/S SVENDBORG and D/S AF 1912 A/S, Appellants-Appellees.

A/S D/S SVENDBORG and D/S AF 1912 A/S, Appellees-Appellants,

v.

MARINE ENGINE SPECIALTIES CORPORATION, Appellant-Appellee.

Nos. 700, 846 and 1006, Dockets 73–2280, 73–2313 and 73–2417.

United States Court of Appeals, Second Circuit.

Argued March 22, 1974.

Decided July 17, 1974.

———◆———

Herman Schmertz, New York City (Gair, Gair & Conason, New York City, of counsel), for appellees-appellants Dorris E. Nye, Susan Pamela Nye, Judith Denise Nye, Gloria Jane Nye, Philip Rex Nye and Donna Charlene Nye.

William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, and Thomas F. Molanphy, New York City, of counsel), for appellees-appellants A/S Svendborg and D/S AF 1912 A/S.

William F. Larkin, New York City (Larkin, Wrenn & Cumisky, and Coppola & D'Onofrio, New York City, of counsel), for appellant-appellee Marine Engine Specialties Corp.

Before MOORE, FEINBERG and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

The t/t Evelyn Maersk is a turbine tanker of 53,277 gross tons and 35,998 net tons. She is approximately 880 feet long, has a molded depth of nearly 60 feet and is powered by a 22,500 shaft horsepower, steam turbine engine. The Evelyn Maersk sailed on her maiden voyage from Elsinore, Denmark, on December 24, 1967, bound for the Persian Gulf. While at sea on December 26, 1967, a feed pump supplying water to the vessel's boilers broke down and the vessel was ordered into Las Palmas, Canary Islands, in order to obtain a replacement for this pump.

The vessel's feed pumps were manufactured by the Pacific Pump Company of California, whose service agent on the Eastern Seaboard of the United States was third party defendant, Marine Engine Specialties Corporation (Marine Engine). Since the Pacific pumps aboard the vessel were still under guarantee, Oreste DeFerro, Service Manager for Pacific's Eastern Division, requested that a qualified representative of the manufacturer proceed to the ship to investigate the situation. Marine Engine dispatched its employee, Charles W. Nye to Las Palmas to board the Evelyn Maersk and continue with her to Capetown, South Africa.

Nye, a graduate of the United States Merchant Marine Academy at Kings Point, was forty-six years old. From 1946 to 1956 he was directly employed by the Pacific Pump Company of California in Huntington Park, California. From 1957 to 1962 he worked, as a specialist in Pacific's pumps, for the L. O. Arringdale Company, agents for Pacific. For the five years immediately preceding the events that underlie this case, i. e., from 1962 to 1967, Nye had been a resident of New Jersey, employed by Marine Engine as a service engineer for pumps manufactured by Pacific. His employment in some instances required him to travel, in his employer's behalf, to far flung ports of call on a moment's notice. He had been married to Dorris Nye for some twenty-two years and they had six children. During all his adult life, indeed even as far back as his early childhood, Nye could be accurately described as grossly obese. He was ap-

proximately six feet in height and he weighed three hundred and fifty pounds.

Nye's excessive weight had given rise to many different health problems. On June 27, 1961, he was admitted to St. Peter's Hospital in New Brunswick, New Jersey, for an evaluation of high blood pressure, obesity and headaches. He was discharged with a diagnosis of hypertension, obesity and hypothyroidism. On January 1, 1965, Nye was diagnosed as having a diabetic condition. On September 6, 1966, in addition to his previous maladies, Nye evidenced protein in his urine, possible kidney disease, swelling of the ankles and Pickwickian Syndrome, a condition marked by lack of oxygen and somnolence in the body due to excessive obesity.

The t/t Evelyn Maersk arrived at Las Palmas at 5:30 a. m. on December 30, 1967, and anchored one-half nautical mile east of the harbor pier. At 6:00 a. m., a spare feed pump was brought out to the ship by a boat from the shore and hoisted aboard. The District Court found that "The defective pump was removed to the deck and the new pump was put in its place by the ship's engineers."

When Nye arrived at Las Palmas he notified the vessel's agents of his presence and informed them of his intention to board the ship. They, in turn, passed that information along to Captain Jensen, the owners' Marine Superintendent aboard the vessel.

Sometime between 4:00 and 5:00 p. m., the ship's crew, pursuant to the orders of Captain Jensen, rigged an accommodation ladder and pilot ladder on the vessel's starboard side in preparation for taking Nye on board.[1] Neither boat ropes nor man ropes were rigged.[2]

About 7:25 p. m., after the launch carrying Nye out to the ship had been sighted, the Evelyn Maersk weighed anchor, was put underway and maneuvered to form a lee on her starboard side in order to effectuate Nye's transfer from the launch.[3]

At 7:30 p. m., the time of boarding, the wind was from the north-northeast at approximately seventeen to twenty-one knots. There were waves from four to eight feet high and night had fallen. At the time of boarding, a five bulb cluster light, totaling 375 watts, was rigged directly above the pilot ladder. Further illumination was provided by a 400 watt gangway light and two 400 watt floodlights.

The launch carrying Nye had to make three passes at the ship before Nye could grab hold of the pilot ladder. Once Nye stepped on to the ladder, the launch moved away. After Nye proceeded up one or two steps on the pilot ladder, he stood still and called for help. Arne Moller, the ship's chief officer, ran half way down the ship's accommodation ladder. By that time, however, Nye had let go of the pilot ladder and had fallen into the sea. Hansen, a seaman who had

1. The accommodation ladder is a rigid aluminum gangway structure which is attached at an angle to the deck railing of the ship. It extends to within eighteen feet of the water. The distance between the end of the accommodation ladder and the sea is traversed by a pilot ladder. The pilot ladder is made of rope and has wooden steps set approximately one foot apart and hangs from the ship's rail to within three feet of the water.

"The manner of boarding by this arrangement was to climb the pilot ladder, which hung parallel to the side of the vessel, until one reached the accommodation ladder. Then the person boarding could simply walk up the accommodation ladder to the deck." Nye v. A/S D/S Svendborg, 358 F.Supp. 145, 148 (S.D.N.Y.1973).

2. A boat rope is simply a line attached to the deck railing used to secure to the ship any vessel coming alongside to transfer cargo or passengers. A man rope is another line, similarly attached, which hangs down the side of the ship adjacent to the ladders, to provide an extra handhold for one who is boarding.

3. A ship "forms a lee" by placing herself between the boarding passenger and the wind. "The purpose of executing the lee is to shield the side of the ship where boarding is to take place from the effects of wind and water motion." Nye v. A/S D/S Svendborg, supra.

been assisting at the boarding, immediately threw a life ring to Nye. Moller then proceeded back up the accommodation ladder and called the bridge to alert the captain of a man overboard and to have the ship's propeller stopped.

By this time two minutes had passed and Nye, grasping the life ring, had drifted about one hundred and ten feet aft of the pilot ladder. A crew member had thrown the free end of a boat ladder over the side of the ship. The purpose of lowering this ladder was to allow a crew member to descend it to grasp Nye as he drifted aft. However, no crew member was sent down this ladder because Moller had by this time turned on an additional spotlight (the starboard lifeboat light) and by its illumination he could see that Nye was no longer holding the life ring. He had vanished.

Moller, with the help of the ship's boatswain, searched the water to the ship's starboard and stern. The launch which had brought Nye to the Evelyn Maersk was also equipped with a spotlight and it too searched the area. The Evelyn Maersk continued in this fashion for about one-half to three-quarters of an hour. It then asked for permission from local authorities to leave the harbor and did so at 10:17 p. m. At no time did the Evelyn Maersk lower a boat into the water. No marker lights, life rafts or additional life rings were thrown into the water. No general alarm was ever sounded aboard the ship. Recovery of Nye's body took place without any help from the officers or crew of the Evelyn Maersk.

Plaintiffs, the wife and children of decedent Nye, instituted this suit against A/S D/S Svendborg and D/S AF 1912 A/S, the owners of the Evelyn Maersk, basing recovery on an alleged two-fold breach of duty: (A) failure to provide decedent, concededly an invitee brought to the vessel as a pump expert, with reasonably safe ingress, in violation of their obligations under the laws of warranty and negligence; (B) negligent failure to take reasonable measures calculated to rescue decedent from the waters.

The District Court, after a trial without a jury, found that defendants had culpably failed to comply with their obligation of safe ingress to decedent in that their agents neglected to follow the commands of good seamanship respecting the furnishing of a boat rope to secure the arriving pilot launch to the vessel, providing a man rope as security in the event of slipping or falling, and placing of a crew member on the rigging to assist the boarding invitee. However, the court found that decedent, a man of unusual physical dimensions, must be charged with fifty percent of the responsibility for failing to request additional boarding apparatus.

The District Court additionally found that the Evelyn Maersk took reasonable steps to rescue Nye under the circumstances.

Finally, the court found that Marine Engine breached its warranty of workmanlike service to the owners of the Evelyn Maersk when it sent a man in Nye's physical condition to the ship and held Marine Engine liable to defendants in indemnity, including counsel fees and costs. Thus, plaintiffs recovered $154,439, reduced by fifty percent to $77,220, plus the sum of $10,434 prejudgment interest or a total award of $87,654, an amount under the trial court's indemnity theory to be borne by Marine Engine.

All parties appeal: plaintiffs claim that their decedent was not contributorily negligent; defendants claim that they were in no way negligent and did, in fact, provide Nye with the means of safe ingress on to their ship; the third party defendant denies its liability in indemnity.

In view of our disposition of this case, it will be unnecessary to consider whether Nye had the status of a seaman or whether the ship was unseaworthy. The ship and its owners, as the District Court held, owed Nye, regardless of his status, a duty of safe ingress.

Thus, only three points remain for consideration: (1) should Marine Engine be required to indemnify the shipowner for the damages resulting from the shipowner's failure, if any, to satisfy its duty to provide safe ingress; (2) was the ship guilty of negligence in its efforts to provide safe ingress or to effect rescue; and (3) was Nye guilty of contributory negligence?

■ The principles set forth in cases dealing with a stevedore's implied warranty of workmanlike performance are not applicable in this case. It was the ship's duty to take all steps necessary under the circumstances to get Nye on board safely. Marine Engine at this juncture played no role in the forthcoming tragedy. Situated in Hoboken, New Jersey, thousands of miles away, it had no control over the operation. The equipment and personnel to be used for Nye's board were supplied by the ship.

■ The only participation which Marine Engine had even remotely connected with Nye's death was in sending him to Las Palmas in the first place. To be sure, the trial judge found that Marine Engine had acted negligently in doing so. However, we believe that the district court's conclusion on this mixed question of fact and law, *see, e. g.*, Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776–778 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), was erroneous and, accordingly, we set it aside. Marine Engine could not have known of the condition of the sea at the time of the attempted boarding, the facilities available to enable Nye to board, or those methods actually to be used. Nye had served the company well over the years on various assignments and, despite his unusual weight problem, apparently without incident which might have put the company on notice that he should not be sent out on any such mission. In short, of all participants Marine Engine would appear to be the least culpable.

■ ■ Indemnity, apart from express contract, can either be implied in law or implied in fact. If it is implied in fact it is said to be derived from the nature of the relationship of the parties. On the other hand, if the right is to be implied in law, it must be based "on a 'great difference' in the gravity of the fault of . . . two tortfeasors; or . . . upon a disproportion or difference in [the] character of the duties owed by the two to the injured plaintiff." W. Prosser, Law of Torts 313 (4th ed. 1971). Application of either theory under the circumstances dictates the conclusion that any negligence leading to Nye's death must be attributed ultimately to the ship and her owners, not to Marine Engine.

This leaves for consideration the issue of the ship's negligence and Nye's contributory negligence.

Hindsight presents the questions: should the ship have offered Nye the safety belt and additional ropes that were available but ultimately not used; should the ship have insisted on their use before Nye attempted to board; should the ship have declared the sea too rough for the transfer; should Nye, realizing his own physical limitations, have requested these additional safety devices before stepping onto the pilot ladder; and should something more have been done to try to effect a rescue?

The District Court answered some of these questions. It found the ship negligent in its conduct; it found the ship's rescue efforts reasonable; and it found Nye fifty percent (50%) contributorily negligent for not having insisted upon adequate safety equipment before making the attempt to board.

■ ■ We see no reason to disturb the trial court's holdings on these issues. To be sure, findings of negligence and contributory negligence involve mixed questions of fact and law and are subject to more stringent appellate review than findings of fact covered by the "clearly erroneous" test. *See, e. g.*, Mamiye Bros. v. Barber Steamship Lines, Inc., *supra*, 360 F.2d at 776–778; Falletta v. Costa Armatori, 476 F.2d 316, 318

(2d Cir. 1973). Nevertheless, such findings should not be set aside where, as here, they rest upon underlying findings of fact which are not themselves clearly erroneous and the trial court's opinion shows a thorough understanding of the applicable principles of law. *See* Dinnerstein v. United States, 486 F.2d 34, 37–38 (2d Cir. 1973).

The trial court's judgment in favor of plaintiffs and against defendants A/S D/S Svendborg and D/S AF 1912 A/S in the sum of $87,654 ($154,439 as found by the District Court, reduced by 50% because of contributory negligence to $77,220 plus pre-judgment interest of $10,434) with costs, is affirmed; the judgment is said amount plus costs, counsel fees and disbursements to be agreed upon or fixed by the Court against the third party defendant in favor of the third party plaintiff is reversed and the third party complaint is dismissed.