**PEOPLES' DEMOCRATIC REPUBLIC OF YEMEN, Plaintiff-Appellee,**

v.

**GOODPASTURE, INC., Defendant-Appellant.**

**No. 1375, Docket 85–7248.**

United States Court of Appeals, Second Circuit.

Argued July 15, 1985.

Decided Jan. 23, 1986.

Stephen P. Kyne, New York City (Christopher H. Dillon, Burke & Parsons, New York City, of counsel), for defendant-appellant.

Richard S. Last, New York City (Dunn & Zuckerman, P.C., New York City, of counsel), for plaintiff-appellee.

Before PIERCE and PRATT, Circuit Judges, and STEWART, Senior United States District Judge for the Southern District of New York sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Defendant Goodpasture, Inc. appeals from a judgment of the United States District Court for the Southern District of New York, Lloyd F. MacMahon, *Judge*, finding after a bench trial that plaintiff Peoples' Democratic Republic of Yemen ("Yemen") has an implied right of indemnification against Goodpasture, and that Yemen is therefore entitled to recover $369,875.39 for certain carrying charges, for deadfreight charges, and for detention charges it incurred in connection with a sale and shipment of wheat.

We reverse. Although Yemen characterizes its claims as being for indemnity rather than for breach of contract, there is no basis on this record for finding indemnity rights, either express or implied. In the end, Yemen's claims amount to no more than allegations that Goodpasture breached certain grain sales contracts. Because this action was brought in 1982, some eight years after the alleged breach in 1974, and because nothing has tolled the applicable four-year statute of limitations, Yemen's action is time barred and must be dismissed. Reaching that simple conclusion, however, requires a fairly lengthy descent into the factual background of this complex controversy.

## BACKGROUND

A. *Insect infested grain and delayed ships: the 1974 dispute between Goodpasture and Yemen*

In May 1974 Goodpasture, as seller, and Yemen, as purchaser, both acting through their respective agents in New York City, entered into two contracts for the sale of grain. Goodpasture, a Texas corporation, was to deliver approximately 36,000 metric tons of wheat on "FAS terms" (free alongside ship) at the Goodpasture grain elevator in the port of Houston, Texas, for loading aboard three ships to be supplied by Yemen. Delivery and loading of the three shipments was to take place in June, July, and August of 1974. Yemen's payment

was to be by means of irrevocable letters of credit which could be negotiated upon presentation of, among other documentation, "clean on-board bills of lading".

To transport the grain, Yemen chartered from the Muhammadi Steamship Company ("Muhammadi") three vessels, the "Al Ahmadi", the "Al Kulsum", and the "Safina-e-Najam". Delivery of the first grain shipment was to take place between June 20 and July 20, 1974, but Yemen's first ship, the "Al Ahmadi", arrived at the Houston elevator on July 26, commenced loading on July 30, completed loading on August 20, and did not depart until August 21. Goodpasture billed Yemen for the actual quantity of bagged grain delivered in this first shipment and received payment through Yemen's letter of credit.

The second ship, the "Al Kulsum", arrived at Houston on September 16, more than a month past the scheduled delivery date. Delayed arrival, however, was only the beginning of the problems involving this second grain shipment. When the "Al Kulsum" arrived at Houston, several of its holds were found to be unclean and contaminated with live insects, so the ship had to be deodorized and fumigated. After passing inspection the ship began loading, but before the loading was completed insect infestation was again found in all but one of the holds. As a result, and after the loading was completed, the ship had to be fumigated a second time.

Claiming that the wheat had already been infested when it was delivered, the "Al Kulsum" refused to issue the "clean on-board bills of lading" that Goodpasture needed under Yemen's letter of credit in order to receive payment for the second shipment of grain. The master of the "Al Kulsum" insisted that the bills of lading be "claused" by describing the wheat as having been contaminated and thereafter fumigated. Goodpasture disputed the claim that the grain was infested prior to loading, and supported its position by dock receipts certifying that the wheat was received in good condition.

To preserve its rights, Goodpasture immediately commenced an in rem action in federal court in Houston and on October 21, 1974, arrested the "Al Kulsum" to prevent her from sailing away with the wheat for which Goodpasture had not been paid. Two days later, after negotiations between the parties, Yemen agreed to pay Goodpasture for the wheat loaded on the "Al Kulsum" by amending the letter of credit to provide for payment against "claused bills of lading". The "Al Kulsum" was released from arrest on October 25 and sailed on October 27.

By this time additional disagreements had surfaced because of increased costs to Goodpasture caused by the delays. On October 8, while the "Al Kulsum" was being loaded, Goodpasture notified Yemen that Goodpasture expected to be paid for carrying charges representing grain storage costs—not only those that had accrued in connection with the delays in Yemen's loading the first two shipments of wheat, but also those that would continue to accrue until the third and final shipment was completed. Goodpasture's demand also included interest on the contract price for the time the three shipments were delayed.

When the third ship chartered by Yemen, the "Safina-e-Najam", arrived at Houston on October 11—again more than a month past the scheduled delivery date—Goodpasture withheld delivery of the third shipment of wheat because Yemen had not yet paid to Goodpasture the claimed carrying charges and interest. This stalemate lasted until November 7, when Yemen agreed to pay Goodpasture $248,129.46 for the alleged carrying charges. After payment was made on November 8, the "Safina-e-Najam" began loading on November 11 and departed on November 27.

Once Yemen had paid Goodpasture for the carrying charges and the "Safina-e-Najam" had sailed, matters appeared, at least at that time, to be settled between Yemen and Goodpasture. Quite unsettled, however, was a set of related disputes between Yemen and Muhammadi, the owner of the three ships.

B. *The arbitrated dispute between Yemen and Muhammadi over deadfreight charges, carrying charges, and other matters*

In January 1975 Muhammadi demanded arbitration with Yemen under the charter parties it had signed for shipping the Goodpasture grain. Muhammadi sought to recover from Yemen for an unpaid balance of the freight charges on all three vessels, for fumigating the "Al Kulsum", and for detention and deadfreight charges for the "Safina-e-Najam". Yemen counterclaimed against Muhammadi, in the arbitration proceeding seeking, *inter alia,* the full $248,-129.46 in carrying charges on the stored grain that Yemen had paid to Goodpasture in November of 1974.

The arbitrators held hearings in November 1975, June 1976, and April 1978, and issued a final award on August 1, 1979 upholding Muhammadi's claims for additional freight costs, for detention costs, for fumigation costs, and for a portion of the deadfreight costs, plus interest; they rejected Yemen's argument that the cargo contamination was the responsibility of the "Al Kulsum". The award explained that the evidence before the arbitrators showed that before loading the ship had been tendered and certified "free of weevils, clean and clear". Yemen's claim against Muhammadi for the carrying charges paid to Goodpasture was denied "for lack of substantiating proof." Although the full amount of the award was $661,183.78, plus interest, Yemen, in February 1981, paid Muhammadi $575,000 in full settlement of the award.

C. *The district court proceedings in the present action*

After settling the arbitration award, Yemen turned back to Goodpasture and on October 20, 1982, filed a federal court complaint against Goodpasture to recover the $248,129.46 in carrying charges it had paid in 1974. Yemen also sought reimbursement for the fumigation charges for the "Al Kulsum" and the deadfreight and detention charges involving the "Safina-e-Na-

jam", which it had been required to pay to Muhammadi. Goodpasture's answer asserted, among other defenses, that Yemen's claims were barred by the statute of limitations for contract claims for the sale of goods, which, in New York, is four years. *See* N.Y.U.C.C. § 2–725(1) (McKinney 1964).

After a nonjury trial, the district court, on December 28, 1984, filed a memorandum decision that rejected Goodpasture's statute of limitations defense. The court reasoned that Yemen's action was based on indemnification rather than on breach of contract, and that the six-year statute of limitations for indemnification claims did not begin to run until February 1981, when Yemen paid Muhammadi in settlement of the arbitration award.

Although the court admitted the arbitration award into evidence, it rejected the arbitrators' finding that Goodpasture had delivered insect-infested grain. Relying on evidence not before the arbitrators, the court found that Yemen had not proved that Goodpasture caused the grain infestation, and it therefore rejected Yemen's claim for the fumigation costs and for the carrying charges incurred as a result of the infestation.

The district court did grant recovery to Yemen, however, on four separate indemnity claims. One claim was for carrying charges due to the delay of the "Al Kulsum" when it was prevented from leaving Houston until the dispute over claused bills of lading was resolved. The second claim was also for carrying charges, but in connection with Goodpasture's refusal to permit the "Safina-e-Najam" to load when it first reached Houston. The third and fourth claims were for deadfreight and detention charges, respectively, incurred on the "Safina-e-Najam".

The decision of December 28 did not specify the amounts recoverable for each of the four claims decided in Yemen's favor, and both parties submitted proposed judgments. On January 14, 1985, the district court issued a supplemental decision and judgment specifying the precise

amount due on each claim and concluding that Goodpasture was liable for a total of $369,875.39. Goodpasture appeals.

## DISCUSSION

■ The central issue on this appeal is whether Yemen's causes of action qualify as indemnity claims that are not time barred, or whether those causes of action are no more than claims of breach of contract not involving indemnity, and subject, therefore, to the four-year statute of limitations period that ended in November of 1978. We conclude that the district court erred because none of the four claims decided in Yemen's favor qualifies as a legitimate indemnity claim. All of Yemen's claims are, therefore, time barred.

### A. *Reimbursement of carrying charges*

The district court found Goodpasture liable to Yemen on four separate indemnity claims, two of which concerned carrying charges. One of these was for $2,359.45, representing the cost for delay of the second ship, the "Al Kulsum", when it was briefly arrested pending resolution of Goodpasture's dispute with Yemen over the claused bills of lading. The second claim for carrying charges was for the delay of the "Safina-e-Najam" from October 21, 1974 to November 5, 1974, and amounted to $20,262.81. Since these delays were, in the district court's view, solely the responsibility of Goodpasture, it required Goodpasture to "indemnify" Yemen for the carrying charges resulting from both delays.

■ An action "does not become an action for indemnity merely because the pleader has so denominated it." *Bunker v. Bunker*, 80 A.D.2d 817, 817, 347 N.Y.S.2d 326, 328 (1st Dep't 1981). An indemnity claim seeks reimbursement for payment made to a third party, but in the present case Yemen paid the carrying charges not to a third party, but to Goodpasture itself when in November 1974 Yemen sought to settle the disputes over carrying charges and the claused bills of lading. Yemen's claim in the present case is thus no more than that Goodpasture delivered contaminated wheat

that caused delays, and then wrongfully forced Yemen to pay extra to cover carrying charges during the period of the delay. Such a claim—for consequential damages resulting from delivery of defective goods—is one for breach of contract, not for indemnity. As a contract claim, it was time barred four years after the November 1974 payment.

Yemen contends that its right to indemnification from Goodpasture did not arise until the 1979 arbitration award foreclosed its attempt to recover from Muhammadi the carrying charges Yemen had paid to Goodpasture in 1974. This argument, however, misinterprets the nature of Yemen's claims. No funds for the carrying charges were paid in 1979. Any claim Yemen had against Goodpasture on the carrying charges would be the principal claim, and Yemen's arbitrated claim against Muhammadi was for indemnity. Yemen cites no authority, and we know of none, that would, upon failure of its indemnity claim, resurrect the claim against its principal. Thus, Yemen cannot obtain indemnity for failure to recover from Muhammadi in the arbitration proceeding.

■ Furthermore, even if there were some way Yemen's claim might properly be viewed as one for indemnity, it would still be time barred by the six-year statute of limitations for an indemnity claim, which, under New York law, would accrue on the date payment is made by the party seeking indemnity. *Bay Ridge Air Rights, Inc. v. State*, 44 N.Y.2d 49, 54, 404 N.Y.S.2d 73, 75, 375 N.E.2d 29 (1978).

### B. *The deadfreight claim*

The district court held Goodpasture liable for $25,876.49 in deadfreight charges incurred on the "Safina-e-Najam" because less grain was loaded than was called for by the charter party between Muhammadi and Yemen. "Deadfreight is freight payable on cargo agreed by charterers to be shipped, but not actually shipped. * * * The space or deadweight capacity which the charterer has failed to use, but on

which freight is nevertheless due, is regarded as being 'dead'." J. Bes, *Chartering and Shipping Terms* 36 (8th ed. 1972).

It is true that the deadfreight payment was made by Yemen to a third party, and that Yemen suffered no loss for deadfreight charges until it paid the arbitration settlement in February 1981. But Yemen's deadfreight claim still amounts to nothing more than a claim for consequential damages from Goodpasture's alleged breach of the 1974 grain sale contracts.

There is no basis in the present case for any right of indemnification running against Goodpasture to the benefit of Yemen. When, as here, there is no express agreement creating a right to indemnification, an implied right to indemnification can still be found in either of two sets of circumstances. *Nye v. A/S/D/S Svendborg*, 501 F.2d 376, 380 (2d Cir.1974). In one, an implied right to indemnification may be based on the special nature of a contractual relationship between parties. *See, e.g., Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956). This has been called an "implied contract theory" of indemnity, *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Authority*, 693 F.2d 1, 2 (1st Cir.1982), or an "implied in fact" indemnity, *Nye*, 501 F.2d at 380. A second set of circumstances in which indemnity may be found has been called "implied in law" indemnity. *Id.* This is a tort-based right to indemnification found when there is a great disparity in the fault of two tortfeasors, and one of the tortfeasors has paid for a loss that was primarily the responsibility of the other. *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 718 (2d Cir.1978); W. Prosser, *Law of Torts* § 51 (4th ed. 1971).

In the present case there is nothing special about the contractual relationship between Goodpasture and Yemen that would warrant implying in fact a contract for indemnification. Their grain sale agreements were fairly ordinary commodities contracts. There simply is nothing in

them or in the parties' dealings from which an agreement to indemnify could "fairly be implied". *Zapico*, 579 F.2d at 719. If an implied contract for indemnification were to be found here, one would have to be found in nearly every commodities sale contract that lacked a clause excluding it, a result that would reverse all standard contract and indemnity law. We therefore conclude there could be no implied contract for indemnity in this case.

Neither is there any reason in this case to impose a tort-based right to indemnification. Tort-based indemnification, or "implied in law" indemnity, is designed to allocate the cost of negligence to the joint tortfeasor primarily responsible. *Galimi v. Jetco, Inc.*, 514 F.2d 949, 952 (2d Cir. 1975); *Nye*, 501 F.2d at 380. Application of this theory is warranted, therefore, when the proposed indemnitor has breached a duty to a third party but the proposed indemnitee has paid the third party for the loss attributable to that breach. In the present case Yemen had to pay the deadfreight claim to Muhammadi because in its charter party Yemen had agreed to make such a payment. Goodpasture had no contract with Muhammadi and Goodpasture's duties to Yemen arose out of their contracts, none of which required Goodpasture to indemnify Yemen for deadfreight charges.

Goodpasture's contracts with Yemen required it to supply Yemen with a specific quantity of grain. Goodpasture had no duty to supply the shipowner with grain. When less grain was loaded on the "Safina-e-Najam" than was anticipated in the charter party between Yemen and Muhammadi, Yemen may have breached its duty to Muhammadi. Goodpasture's obligations, however, are measured not by Yemen's charter party with Muhammadi, but by Yemen's contract with Goodpasture. If the deadfreight charges were foreseeable consequential damages from breach of the Yemen-Goodpasture contract, they would be recoverable, if at all, in an action for breach of that contract. Such an action, however, would be subject to New York's four-year

statute of limitations, and therefore time barred as of November 1978.

### C. *The detention charges*

█ The district court found Goodpasture liable for $227,163.22 in detention charges resulting from its refusal to dock and load the "Safina-e-Najam" from October 21 until November 10, 1974. The district court reasoned that "[s]ince defendant's actions alone contributed to the detention, defendant is liable for the resulting charges." We reverse on this claim because there is no more basis for any implied right of indemnification—under either a contract theory or a tort theory—on these detention charges than there was for such an implied right on the deadfreight claim, discussed above.

Goodpasture had no general duty to the shipowner to dock and load the "Safina-e-Najam", and any particular duty Goodpasture may have had with respect to the grain ran to Yemen under the 1974 commodities contracts. If there was a duty under the grain sale contracts to dock the ship Yemen had chartered and to provide the grain that was to be loaded onto that ship, that duty ran to Yemen, not to the shipowner, and any breach of that duty was properly the subject of a contract action, not an indemnity action. Detention charges may be foreseeable consequential damages, and might have been, if proved, recoverable in a contract action brought by Yemen against Goodpasture. Such an action, however, was not commenced within the four-year statute of limitations period and is therefore barred.

Moreover, even if Yemen's claim for detention charges for delays in docking and loading the "Safina-e-Najam" were not time barred the district court clearly erred in finding that Goodpasture was solely responsible for those delays. The district court reasoned that "defendant [Goodpasture] is responsible for the delay after presentation because it prevented the Safina-e-Najam from loading during the dispute over the carrying charges.... Since defendant's actions alone contributed to the detention, defendant is liable for the resulting charges." That conclusion, however, is not supported by any finding that Goodpasture's refusal to berth the ship breached any duty owed to Yemen or to the ship; moreover, it conflicts with other findings made by the district court.

Goodpasture could be held liable for the detention costs only if it had a duty to avoid the delay of the "Safina-e-Najam" between October 21 and November 10, 1974. While there may have been such a duty under the original contracts between Yemen and Goodpasture, Goodpasture's withholding of delivery because Yemen had failed to make the payment with unclaused bills of lading as required by the contract, is supported by U.C.C. § 2–703(a). *See* N.Y.U.C.C. § 2–703(a) (McKinney 1964). Yet this point was not addressed by the district court.

Furthermore, the district court's finding that the wheat was not contaminated prior to the loading of the "Al Kulsum" suggests that Goodpasture was justified in refusing to accept the claused bills of lading. Thus, the district court's lack of discussion of Goodpasture's right to delay the berthing of the "Safina-e-Najam", together with its finding that implies that Goodpasture had such a right, undermines the district court's conclusion that Goodpasture was solely responsible for the detention.

### CONCLUSION

In view of our disposition of the foregoing issues, Yemen's complaint must be dismissed. It is unnecessary to discuss the two remaining issues, admissibility of the arbitration award and reduction of the indemnification claims to reflect the settlement, because those questions have become moot.

We reverse the district court's judgment and remand with a direction that the complaint be dismissed.