**OLEFINS TRADING, INC., Appellant,**

v.

**HAN YANG CHEM CORPORATION,
Appellee.**

Nos. 93–5135, 93–5138.

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1993.

Decided Nov. 9, 1993.

Eric D. Grayson (argued), Law Offices of Eric D. Grayson, Greenwich, CT, for appellant Olefins Trading, Inc.

Jeffrey S. Cook (argued), Anthony J. Laura, Kelley Drye & Warren, Parsippany, N.J., for appellee Han Yang Chemical Corp.

Before: MANSMANN, GREENBERG, and WEIS, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

We are asked to determine whether the magistrate judge, trying the matter with a jury by consent of the parties, erred in granting a renewed motion for judgment as a matter of law in this diversity case brought under New Jersey's law of contracts. Although both parties in this breach of contract action acknowledge the existence of a valid contract, they disagree on whether a particular term was included in that contract. In overturning the jury's verdict, which specifically found that a material breach of contract had occurred, the court erroneously applied § 2–207 of the Uniform Commercial Code

("UCC")[1] to excise an express term of the oral modified contract formed by the parties in this dispute. We will vacate the judgment and remand for the trial court to consider part of the defendant's concurrent motion for a new trial.

## I.

The salient historical facts that form the basis of this appeal are largely undisputed. We set them forth in the light most favorable to the verdict winner, the plaintiff-appellant, Olefins Trading, Inc.

Olefins is a Connecticut corporation engaged in the trading and marketing of bulk chemicals and chemical products. Han Yang Corp. is a South Korean Corporation and is engaged in the manufacture of petrochemical products. Han Yang maintains an office in New Jersey for the purpose of "sourcing" chemicals for use in its petrochemical business. On or about March 12, 1991, Y.I. Han of Olefins began preliminary negotiations with Han Yang regarding the sale of bulk ethylene.

On March 13, 1991, Y.I. Han of Olefins and Shin Lee of Han Yang exchanged written confirmation letters outlining the terms of an oral contract formed by the parties on that date. Under the terms of the oral contract, Han Yang promised to purchase 4500 metric tons ("mt") of bulk ethylene (±5% at Olefins' option) from Olefins at a price of $915/mt. In exchange for Han Yang's promise to purchase, Olefins promised to sell and deliver the ethylene one month later to Han Yang's manufacturing facility in Yeosu, South Korea. Both parties agreed that payment was to be made via a letter of credit in the amount of $4,117,500. Although contested at trial, the jury found that Han Yang had promised to open this letter of credit by March 15, 1991. In addition, both parties agreed that Olefins' chemical supplier, Repsol Petroleo, would produce the ethylene and would ship it directly from Tarragona, Spain to Yeosu, South Korea.

On March 14, 1991, Olefins entered into a supply contract with Repsol for the purchase and sale of 4500mt of ethylene in order to satisfy its obligation to Han Yang. Olefins promised to pay Repsol $890/mt for the ethylene. That same day, Olefins nominated the ship *Teviot* as the cargo vessel that would transport the ethylene from Spain to South Korea. At trial, both Olefins and Han Yang stipulated that the *Teviot* could carry exactly 4600mt of ethylene.

As of March 13, 1991, Olefins and Han Yang were bound by a valid contract for the purchase and sale of 4500mt of ethylene at a price of $915/mt. Shortly after the contract was formed, however, the international market price of ethylene began to drop dramatically. By early April of 1991, the market price of ethylene was set at approximately $600/mt on a CIF basis ("cost, insurance and freight") to South Korea, almost $300/mt less than the international market price two weeks earlier. As of April 2, 1991, Han Yang still had not opened a letter of credit as originally agreed.

On April 2, 1991, Shin Lee of Han Yang contacted Y.I. Han of Olefins to see whether the original contract could be renegotiated. After some initial resistance, Shin Lee successfully negotiated a modification to the original contract on April 4, 1991. The precise terms of this modified oral contract are the subject of this appeal.

On April 4, 1991, both parties orally agreed to reduce the quantity of ethylene from 4500mt (±5%) to 4200mt (maximum) and to discount the price from $915/mt to $900/mt. Olefins asserts that both parties also orally agreed that Han Yang would issue Olefins a "commercial credit" in the amount of $238,125 by April 5, 1991; this sum was to be paid to Olefins in the *next* Olefins–Han Yang transaction. Olefins alleges that the parties intended the commercial credit to compensate Olefins for its losses in modifying the original contract and indeed was Han Yang's certification that it owed Olefins the

---

**1.** The parties do not dispute that the laws of New Jersey apply in this diversity action. Because New Jersey has adopted the UCC, N.J.S.A. 12A:1–101 to 11–108, we refer directly to the various provisions of the UCC. *New Jersey Bank,*

*N.A. v. Bradford Securities Operations, Inc.,* 690 F.2d 339, 343 n. 9 (3d Cir.1982); *see Step–Saver Data Sys., Inc. v. Wyse Technology,* 939 F.2d 91, 94 n. 6 (3d Cir.1991).

$238,125. Han Yang vehemently denied having assented to this latter term.

■ After the parties' oral negotiations concluded, Han Yang sent Olefins a revised purchase confirmation recounting the terms of the modified ethylene contract.[2] The confirmation contained the new quantity and discounted price for the modified ethylene contract, but it did not mention the commercial credit. Olefins responded by insisting that Han Yang concede the commercial credit in the amount of $238,125 "as per agreed on the phone." Han Yang did not respond.

On April 8, 1991, Olefins sent Han Yang a letter demanding that Han Yang open a letter of credit immediately "along with a letter confirming commercial settlement of [Olefins'] estimated losses equalling U.S.$238,-125." Again, Han Yang did not accede to the commercial credit term, but on April 9, 1991, Han Yang opened a letter of credit in the modified contract amount of $3,780,000 (4200mt × $900/mt), naming Olefins as the beneficiary.

On April 19, 1991, Olefins extended an offer to Han Yang for another shipment of bulk ethylene to Yeosu, South Korea. Ostensibly, this offer was made by Olefins to enable it to recover the commercial credit from the April 4, 1991 transaction. Han Yang rejected this offer.

On April 23, 1991, the *Teviot* was loaded with 4174mt of ethylene, bound for South Korea. Olefins then sent Han Yang an invoice for $233,238.21 as an expression of its actual losses suffered under the modified contract. This sum included $62,613.21 in lost profits[3] and a deadfreight charge[4] of $170,625.00. The deadfreight charge was later reduced to $132,632.34 when the parties discovered that the *Teviot* was only capable of carrying 4600mt of ethylene. Accordingly, Olefins asserted that Han Yang caused it to suffer actual losses under the modified contract in the amount of $195,245.55.[5]

■ At the close of the trial, the trial judge instructed the jury on the basic concepts of contract formation. He then instructed the jury on the particular issues in the case. Regarding the alleged breach of the April 4, 1991 contract, namely, whether Han Yang had breached an oral contract by failing to issue a commercial credit to Olefins, the trial judge instructed the jury as follows:

Now, the plaintiff contends that the parties entered into a modified contract which supplanted the initial contract and that defendant breached the modified contract by not issuing to plaintiff a commercial credit.

In order to find for the plaintiff on this claim, you must first find from all the evidence presented that the defendant Han Yang agreed to provide such a commercial credit. In order to determine whether a commercial credit term was part of the modified contract, you should consider whether such a term materially altered the parties' agreement or whether the defendant notified the plaintiff of its objection to the inclusion of such a term. If you find that such a term materially altered the agreement, or that the defendant properly

2. We note that this revised purchase confirmation provided the necessary writing to satisfy the statute of frauds, a matter not disputed by the parties. *See* UCC § 2–201. Under the UCC, all contracts "for the sale of goods for the price of $500 or more" must be in writing. UCC § 2–201. In order to satisfy this requirement, there must be "(1) a writing indicating a contract for sale, (2) signed by the party to be charged, and (3) the quantity term must be expressly stated." *Cohn v. Fisher*, 118 N.J.Super. 286, 287 A.2d 222, 226 (Law Div.1972). We find that Han Yang's confirmatory memorandum of April 4, 1991 satisfied all three of these requirements.

3. The lost profits were calculated by multiplying $15 (the difference between the original contract price per metric ton and the April 4, 1991 price per metric ton) by the amount of actual tonnage of ethylene delivered to Han Yang ($15 × 4174.-214mt = $62,613.21).

4. This charge reflects the freight rate for every ton of ethylene not shipped aboard the *Teviot*. The ship's owner would charge Repsol for this waste and Repsol would charge Olefins. Olefins would then pass the charge to Han Yang. On July 31, 1991, Olefins received an invoice from Repsol in the amount of $171,636.50. This invoice reflected a freight rate of $311.50/mt and a deficiency of 551mt of ethylene aboard the *Teviot*.

5. The jury subsequently awarded this amount to Olefins.

objected to it, then you must find that it was not part of the agreement between the parties and you must return a verdict for the defendant.

If you find that the commercial credit term was part of the modified contract, you may find that Han Yang's failure to issue the commercial credit was a breach. Tr. at 525–26. Based on this instruction, "[t]he jury returned the special verdict questionnaire, finding that Han Yang had breached a material term of the April 4, 1991 agreement by not providing a commercial credit by April 5, 1991." [6] *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 813 F.Supp. 310, 316 (D.N.J.1993). The jury assigned a value to the commercial credit term by returning a verdict for $195,245.55 in favor of Olefins. According to the trial court, the value of the commercial credit term was calculated by adding $62,613.21 in lost profits and $132,632.34 as remuneration for the deadfreight.[7]

On November 18, 1992, Han Yang filed a renewed motion for judgment as a matter of law and a motion for a new trial, asserting that the commercial credit was never an agreed upon term and that Olefins attempted to unilaterally introduce the commercial credit term into the contract when Olefins sent its response to Han Yang's revised purchase confirmation on April 4, 1991. Moreover, Han Yang contended that UCC § 2–207 prevents the introduction of any additional terms that materially alter the contract. As a result, Han Yang argued that the commercial credit term must be excised from the Olefins–Han Yang contract as a matter of law.·

On February 11, 1993, the trial court issued an Opinion and Order granting Han Yang's Rule 50(b) motion on the basis that, as a matter of law, "there [was] a 'complete absence of pleading or proof on an issue or issues material to the cause of action or defense.'" *Olefins Trading*, 813 F.Supp. at 314 (quoting 2A James W. Moore, *Moore's Federal Practice* § 50.02 (2d ed. 1992–93)). The district court observed that UCC 2–207(2)(b) prevented additional, material terms from becoming a part of a contract as a matter of law. Accordingly, the court held that "[t]he jury's verdict [was] thus contrary to the dictates of the law, and as such [could not] stand." *Id.* at 316. Contrary to *Fed. R.Civ.Proc.* 50(c)(1), the court did not issue a conditional ruling on Han Yang's motion for a new trial.

The district court exercised subject-matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. We exercise appellate jurisdiction over the final Order and Judgment of the district court pursuant to 28 U.S.C. § 1291.[8]

---

**6.** The jury returned the following verdict (in part):

> 3. Was there a contract on April 4, 1991 between the parties for the sale of 4200 metric tons of ethylene?
> Yes _X_ No___
> (A) If yes, did such agreement take the place of a prior agreement?
> Yes _X_ No___
> (B) Did plaintiff agree to waive its rights under a prior agreement?
> Yes _X_ No___
> (C) If yes, did defendant, Han Yang, breach the modified agreement?
> Yes _X_ No___
> (D) If yes, was the breach material?
> Yes _X_ No___

Tr. at 555–56.

**7.** Han Yang contends that deadfreight charges are "consequential damages" and are, therefore, not recoverable by Olefins under UCC § 2–710. Appellee's Br. at 33–35 (citing *Peoples' Democrat-*

*ic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir.1986)). Our examination of the statute yields a different result. The New Jersey Study Comment to UCC § 2–710 defines "incidental damages" as those "additional expenses reasonably incurred by the aggrieved party by reason of the breach. They would include resale charges, storage charges, notice charges and the like." *Id.* We believe that the deadfreight charge in this case uniquely qualifies under UCC § 2–710 as recoverable "incidental damages" under this definition. Consequently, we find Han Yang's argument on this issue to be without merit.

**8.** We note that because Olefins' post-judgment motion for pre-judgment interest was mooted after the district court granted Han Yang's Rule 50(b) motion, our jurisdiction over the merits of this appeal has not been impaired. Should the trial court deny Han Yang's motion for a new trial, Olefins may renew its motion for pre-judgment interest within ten days after the district court judgment has been filed.

## II.

Article 2 of the Uniform Commercial Code applies to all "transactions in goods." UCC § 2–102. Because ethylene is considered to be a "good," the provisions of Article 2 govern the Olefins–Han Yang contract if applicable. However, we note that Article 1 makes clear that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity ... shall supplement its provisions." UCC § 1–103. Indeed, Professors White and Summers caution that "parties will often contract expressly as to quality, quantity, price, and some aspects of delivery and payment. In general, their agreement without more will be sufficient to displace any otherwise applicable Code provisions." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–2, at 131 (3d ed. 1988); *see also* Ronald A. Anderson, *Uniform Commercial Code* § 1–103:22 (1970). Pursuant to UCC § 1–103, then, we must first determine whether Olefins and Han Yang were bound by an oral contract under New Jersey common law. Because both parties have acknowledged the existence of a contract, our task is to ascertain whether there was a common agreement on the inclusion of the commercial credit term.

■ Under New Jersey law, one of the primary requisites to the formation of any contract is mutual assent. *Leitner v. Braen*, 51 N.J.Super. 31, 143 A.2d 256, 260 (App.Div. 1958); *see Cohn v. Fisher*, 118 N.J.Super. 286, 287 A.2d 222, 224 (Law Div.1972). In addition to contract formation, mutual assent over the inclusion of a particular contractual term binds the parties thereby. *Leitner*, 143 A.2d at 260.

■ The question of whether the parties have mutually assented to a term is peculiarly a question of fact and properly placed with the fact-finder. *United McGill Corp. v. Gerngross Corp.*, 689 F.2d 52, 53 (3d Cir. 1982). In returning a verdict in favor of Olefins, the jury specifically found that Han Yang had expressly agreed to issue the commercial credit to Olefins. Our task is not to disturb that finding; rather, we must enforce the verdict unless it is not supported by the evidence in the record or is otherwise contrary to the law.

### A.

■ Han Yang argues that the jury verdict is contrary to the law because UCC § 2–207 prevents the commercial credit term from becoming a part of the Olefins–Han Yang contract.[9] We disagree. We hold—consistent with the jury verdict—that because the commercial credit term was specifically agreed upon over the telephone *before* the parties exchanged confirmatory memoranda, UCC § 2–207 may not be utilized to exclude that term from the contract.

■ Section 2–207 of the UCC is designed to prescribe, by law, what *non-negotiated* terms are to be considered a part of a

**9.** Han Yang asserts that Olefins is barred from challenging the applicability of UCC § 2–207 because it did not object to the trial judge's instructions on this issue. Appellee's Br. at 18. Hang Yang cites *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 900 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), for the proposition that this Court is precluded from reversing on the ground of an erroneous jury instruction because Olefins did not object to the instruction before the jury retired to consider its verdict. Appellee's Br. at 18. It appears that Han Yang has misinterpreted *Tose*, or perhaps has misapplied it.

In *Tose*, the party was barred from raising on appeal an erroneous jury instruction because the party did not object before the jury deliberated. *Tose*, 648 F.2d at 900. Specifically, we agreed that the district court erred when it instructed the jury to relieve the opposing party of liability under a contract if the jury found that the oppos-

ing party was not aware of the contents of the document he was signing. *Id.* Nevertheless, we observed that this specific instruction was unchallenged at trial, and therefore, an assignment of error to the judge's instructions could not be raised on appeal. We applied Rule 51 of the Federal Rules of Civil Procedure: "No party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of his objection."

This case differs markedly from *Tose* in that Olefins is not assigning error to the trial judge's instructions to the jury. Instead, Olefins is arguing that the Rule 50(b) motion should be overturned because there is sufficient evidence in the record to sustain the jury's finding that Han Yang breached a material, negotiated term in their contract. Accordingly, we find this argument to be without merit.

contract—not to exclude those terms specifically negotiated and agreed upon. One of the main purposes of UCC § 2–207 is to facilitate oral contracts that are usually negotiated over the telephone and only later reduced to a writing. In particular, UCC § 2–207 is designed to serve as a way of dealing with conflicting or additional terms that were never a part of the bargaining process. *See, e.g., Step–Saver Data Sys., Inc. v. Wyse Technology,* 939 F.2d 91, 98 (3d Cir.1991); *Ebasco Servs., Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 206 (E.D.Pa. 1978). In other words, terms governed by UCC § 2–207 are those terms that were never expressly agreed upon; rather, they appear only later as non-negotiated terms in confirmatory memoranda or other types of business forms purporting to "confirm" what was previously discussed orally. UCC § 2–201 Official Comment 1.

This is not the situation before us. Here, Olefins and Han Yang expressly agreed to the commercial credit term. It is that agreement which must control. *See* Karl N. LLewellyn, *The Common Law Tradition: Deciding Appeals* 370–71 (1960) ("[UCC § 2–207 may not be used to] alter or impair the fair meaning of the dickered terms"); *see also* John E. Murray, Jr., *Intention Over Terms: An Exploration of UCC 2–207 and New Section 60, Restatement of Contracts,* 37 Fordham L.Rev. 317, 320 (1969) (explaining that when parties exchange conflicting confirmatory memoranda, "the contract consists of the terms upon which the parties *originally agreed,* terms on which the confirmations agree and terms supplied by the Code").

### B.

■ Having concluded that the jury's verdict was not contrary to the law, we must now consider whether it was supported by sufficient evidence in the record. Pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure, the court may grant a renewed motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for" the prevailing party. *Fed.R.Civ.Proc.* 50(b). The "legally sufficient evidentiary basis" has also been characterized as a "minimum quantum of evidence," *Keith v. Truck Stops Corp.,* 909 F.2d 743, 745 (3d Cir.1990), or even as "any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.,* 832 F.2d 258, 259 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Accordingly, if there is minimally sufficient evidence to support the jury's finding that the commercial credit was an orally agreed upon term, then the court erred in granting Han Yang's Rule 50(b) motion.

At trial, Y.I. Han of Olefins testified that during the telephone conversation of April 4, 1991, Han Yang's president expressly agreed to issue a commercial credit to Olefins. Specifically, Y.I. Han testified as follows:

Q. Did [Han Yang] ever indicate to you that a commercial credit would be opened?

A. Commercial credit or letter of credit?

Q. Commercial credit.

A. They said they would send us a letter, commercial letter.

Q. And what did you understand this commercial letter to be, sir?

A. As described in this Fax [P–20], that amount specifying the amount, and to be compensated to Olefins Trading on next transaction.

Tr. at 71. Y.I. Han also referred to Plaintiff's Exhibit 20. Olefins' response to Han Yang's revised purchase confirmation of April 4, 1991. Olefins' response (P–20) specifically insisted that Han Yang concede the commercial credit term of the oral contract:

WE RECEIVED YOUR REVISED PURCHASE [CONFIRMATION OF APRIL 4, 1991]. HOWEVER, FOLLOWING MUST BE DONE BY HANYANG [SIC] IMMEDIATELY WITHIN APRIL 5, 1991.

1. L/C TO BE OPENED IN WORKABLE FORM.

2. HANYANG'S [SIC] LETTER FOR COMMERCIAL ·CREDIT TO CHEMICAL/OLEFINS TRADING FOR THE AMOUNT OF USD238,125 WHICH TO BE COMPENSATED TO US IN NEXT TRANSACTION *AS PER AGREED ON THE PHONE* WITH MR. LEE [OF HAN YANG].

Tr. at 570 (emphasis added). Olefins sent another demand for the commercial credit on April 5, 1991. Tr. at 571. Finally, on April 8, 1991, Olefins informed Han Yang that Olefins would pursue legal action against Han Yang for not issuing the commercial credit. Tr. at 572.

We find further support that there was an oral agreement on the commercial credit term in the testimony of Han Yang's president, Shin Lee. On cross examination, Mr. Lee was questioned about certain notations he made on a telefax message that he had received from Olefins earlier that day. As to whether Han Yang had agreed to supply the commercial credit to Olefins, Mr. Lee answered plaintiff's counsel as follows:

Q. In the commercial credit I see that in this section, condition one, 194625 is circled. Did you circle that?

A. I think so.

Q. Is this your handwriting, 238125, sir?

A. Yes.

Q. You were discussing this with [Y.I. Han of Olefins], weren't you, sir?

A. Not discussing, [Y.I. Han] told me in that kind of amount.

Q. He told you that amount?

A. Yeah.

Q. And didn't [Y.I. Han] tell you that if [Olefins] dropped the quantity to 4200 and raised the price to 900 the amount that you will owe is 238125? Is that correct?

A. Right.

Q. So you did discuss this condition with him, didn't you?

A. No, I did not discuss for conditions.

Q. Didn't discuss them?

A. No.

Tr. at 373–74. Indeed, the trial judge recognized that this testimony alone provided a sufficient basis for the jury to find in favor of Olefins. In originally denying Han Yang's motion for directed verdict, the trial judge made the following observation:

I believe that the jury can find, again giving the plaintiff all favorable inferences from the testimony of Mr. Lee, that there was an agreement that Mr. Lee was aware of, that he was negotiating this transaction on behalf of the defendant and that in his words he thought the plaintiff was giving a favor in value of $238,000 to the defendant. It's a question of fact as to whether that testimony is credible, and from that testimony alone I find that a jury could reasonably find that there was a contract and that the defendant breached it.

Tr. at 465.

On the basis of this testimony and the telefax messages from Olefins and Han Yang, we conclude that there is sufficient evidence in the record to provide the "legally sufficient evidentiary basis" necessary to sustain the jury's verdict under Rule 50(a)(1). Consequently, we find that the district court erred by granting Han Yang's renewed motion for judgment as a matter of law. We turn now to Han Yang's motion for a new trial.

### III.

Assigning three grounds in support of its motion for a new trial, Han Yang alleged in its oral motion before the trial court that a new trial was warranted because (1) the jury's verdict is contrary to the great weight of the evidence; (2) there was trial misconduct by Olefins' counsel; and (3) evidence was introduced at trial that resulted in "harmful error." Tr. at 681–82. In the interest of judicial economy, we believe that we have a sufficient basis in the record to rule on the first of these three grounds. *See Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1229 (3d Cir.1989).

As an appellate court, we review a district court's grant or denial of a new trial motion by applying the deferential "abuse of discretion" standard to the ruling.[10] Nonetheless, we note that the district court's power to grant a new trial motion is limited to those circumstances "where 'a miscarriage of justice would result if the verdict were to stand.'" *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992)

---

10. While the district court actually did not exercise discretion with respect to Han Yang's motion for a new trial, we are, in effect, treating its ruling as having granted a new trial on the basis that the verdict was contrary to the great weight of the evidence.

(quoting *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991)), *cert. denied,* ── U.S. ──, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). As we explained in *Fineman,* the purpose of this rule is to ensure that the trial court does not supplant the jury verdict with its own interpretation of the facts. *Id.* (citing *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.) *(in banc), cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

 As we have concluded earlier, the evidence in the record clearly supports the jury's finding that an oral contract was formed over the telephone on April 4, 1991. Notwithstanding this finding, the district court concluded that "a contract was formed *by the exchange of writings* that took place on April 4, 1991." *Olefins Trading,* 813 F.Supp. at 315 (emphasis added). We are convinced that it was this erroneous finding that led the district court to apply UCC § 2-207 to exclude the commercial credit term from the Olefins–Han Yang contract. In this regard, we find that the district court usurped the province of the jury. Accordingly, we hold that the jury verdict was not "against the great weight of the evidence" as asserted by Han Yang and that it is not entitled to a new trial on this ground.

 Because the district court did not issue a conditional ruling on Han Yang's Rule 59 motion, we are regrettably persuaded that we must remand this cause for further consideration of the remaining two alleged grounds for a new trial. In reviewing a Rule 59 motion based on prejudicial misconduct by opposing counsel, " '[w]e recognize that the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial.' " *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993) (quoting *Draper v. Airco, Inc.,* 580 F.2d 91, 94 (3d Cir.1978)); *Fineman,* 980 F.2d at 207. This deferential standard of review also applies to new trial motions based on the erroneous admission of evidence. *See Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 133 (3d Cir.1991) ("In matters of trial procedure ... the trial judge is entrusted with wide discretion because he is in a far better position than we to appraise the effect of the [admission of evidence].”), *cert. denied,* ── U.S. ──, 113 S.Ct. 1584, 123 L.Ed.2d 151 (1993).

In the present case, we observe that the trial judge did not exercise his discretion to grant or deny Han Yang's motion for a new trial based on either misconduct by opposing counsel or the erroneous admission of evidence. As a result, there is no exercise of discretion by the trial judge against which we can apply our deferential standard of review. Consequently, we are unable to pass on Han Yang's remaining two grounds for a new trial.

### IV.

We will vacate the order of the district court granting Han Yang's renewed motion for judgment as a matter of law. We will instruct the district court to consider Han Yang's motion for a new trial to the extent that allegations of misconduct and the erroneous introduction of evidence are asserted.