AMERICAN TRANSTECH
INC., Plaintiff,

v.

U.S. TRUST CORP., Defendant
and Third–Party Plaintiff,

v.

SHEA & GOULD, a partnership,
Third–Party Defendant.

No. 94 Civ. 1034 (DAB).

United States District Court,
S.D. New York.

July 16, 1996.

Sidley & Austin, New York City (Elizabeth M. Sacksteder, of counsel), for Plaintiff.

Kronish, Lieb, Weiner & Hellman, New York City (Brian J. Gallagher, Deborah K. Sorell, Stephen Brodsky, of counsel), for Defendant/Third–Party Plaintiff.

Law Office of Christopher Lometti, New York City (Christopher Lometti, of counsel), for Third–Party Defendant.

### MEMORANDUM and ORDER

BATTS, District Judge.

This action arises out of a Stock Purchase Agreement (the "Agreement"), dated December 22, 1988, between the Plaintiff, American Transtech Inc. ("Transtech"), and the Defendant, U.S. Trust Corporation ("U.S. Trust"), under which Transtech purchased Advanced Information Management, Inc. ("AIM"). On February 16, 1994, Transtech commenced this action against U.S. Trust seeking indemnification for materially inaccurate statements, and alleging fraud and fraudulent concealment.

U.S. Trust denied Transtech's allegations, and now argues that the Complaint fails to state a claim upon which relief may be granted. U.S. Trust contends that it made no knowing misrepresentation to Transtech in the Stock Purchase Agreement and that, "to the best knowledge" of U.S. Trust, it made no inaccurate statements in the Agreement regarding any material claims against AIM. Indeed, U.S. Trust claims that it was not advised by counsel for AIM, Shea & Gould ("S & G"), of the extent of possible financial exposure at issue when it entered into the Agreement with Transtech.

Accordingly, by Third–Party Complaint dated February 16, 1994, U.S. Trust commenced a third-party action against S & G, seeking indemnification for any judgment in this action in favor of Transtech and against U.S. Trust, on the grounds that S & G approved the Agreement's text and were the source of the disclosures in the Agreement that are the subject of Transtech's Complaint.

S & G move for summary judgment asserting that U.S. Trust cannot, as a matter of law, recover from them for indemnification; and furthermore, that S & G made no representations upon which U.S. Trust could rely.

## I. FACTUAL BACKGROUND

### A. The Equitable Tower Lawsuit

Prior to U.S. Trust's acquisition of AIM in 1986, AIM had entered into a lease (the "Lease"), dated May 30, 1984, for office space in New York City with a landlord known as Equitable Tower Associates ("Equitable Tower"). (Pl.'s & Def.'s 3(g) Statements ¶ 12; Third–Party Def.'s 3(g) Statement Ex. A.) Paragraphs 18 and 19 of the Lease provide for the remedies available in case of a default.

On or about June 4, 1985, Equitable Tower commenced a holdover proceeding against AIM which alleged that AIM breached the Lease ("Equitable Tower Lawsuit"). (Pl.'s & Def.'s 3(g) Statements ¶ 13; Third–Party Def.'s 3(g) Statement Ex. B.) Equitable Tower sought: (1) possession of the premises; (2) $76,463.78 in rent arrears; (3) a money award for the reasonable value of the use and occupation of the premises; and (4) issuance of a warrant to remove AIM from the right of possession of the premises. (Pl.'s 3(g) Statement ¶ 76; Def.'s 3(g) Statement ¶ 13; Third–Party Def.'s 3(g) Statement ¶ 2 & Ex. B.) AIM vacated the premises[1] on or about October 30, 1985. (Fahey Dep. at 97 & Fahey Ex. 25.)

On August 6, 1985, shortly before the trial of the Equitable Tower Lawsuit, Equitable Tower and AIM entered into a written stipulation ("Stipulation"), to amend Equitable Tower's petition, in which they agreed that Equitable Tower's claim for rent, if it was entitled to it, from July 15, 1984, through May 31, 1985, amounted to $188,053.95, and that it could be entitled to the use and occupancy from June 1, 1985, to the date AIM vacated the premises. (Pl.'s 3(g) Statement ¶¶ 78–81; Def.'s 3(g) Statement ¶¶ 78–81, 123; Adler Ex. 6.) Under the Stipulation, if AIM were found to be liable to Equitable Tower under the Lease, Equitable Tower could obtain a judgment of as much as $317,350.20 against AIM. (Pl.'s & Def.'s 3(g) Statements ¶ 82; Adler Ex. 6.) By the time post-trial briefs were submitted, AIM had paid $26,808.94, reducing its potential liability under the Stipulation to $290,542.20. (Pl.'s & Def.'s 3(g) Statements ¶ 86; Adler Ex. 10.)

The trial commenced on August 8, 1985, and the New York Civil Court dismissed both Equitable Tower's petition and an AIM counterclaim on December 31, 1985. (Pl.'s & Def.'s 3(g) Statements ¶¶ 89–90; Portnoy Ex. 2.) Equitable Tower noticed an appeal on March 26, 1986. (Pl.'s & Def.'s 3(g) Statements ¶ 91; Portnoy Ex. 2.) That appeal was still in the process of being perfected when Transtech purchased AIM from U.S. Trust in December 1988. (Pl.'s & Def.'s 3(g) Statements ¶ 92; Adler Dep. at 85; Fahey Dep. at 111; Portnoy Dep. at 46–47.)

On December 22, 1988, Transtech and U.S. Trust entered into the Agreement which provided that Transtech would acquire from U.S. Trust all its outstanding capital stock of AIM. (Pl.'s & Def.'s 3(g) Statements ¶ 7.) On or about December 31, 1988, pursuant to the Agreement, Transtech purchased the AIM stock. (Pl.'s & Def.'s 3(g) Statements ¶ 11; Third–Party Def.'s 3(g) Statement Ex. K.)

On October 12, 1989, the Appellate Term reversed the decision of the Civil Court and remanded the case. (Pl.'s & Def.'s 3(g) Statements ¶ 102; Adler Exs. 31–32.) In November 1989, S & G moved for reargument and leave to appeal the Appellate Term's decision. (Pl.'s & Def.'s 3(g) Statements ¶ 103.) In 1990, that motion was denied. (Pl.'s & Def.'s 3(g) Statements ¶ 104.) On October 2, 1990, Transtech notified U.S. Trust that it had

> been contacted by Eric Zimmerman of Shea and Gould to advise [ ] that the summary judgment in our favor was overturned on appeal. Mr. Zimmerman is currently awaiting directions as to whether or not to challenge the decision. Obviously, a choice needs to be made whether or not to expend the funds for a challenge or await notice of retrial. . . . Inasmuch as we may again find ourselves seeking indemnification for any settlements in this matter from U.S. Trust, I would appreciate your advice on how you would like us to proceed. (Pl.'s & Def.'s 3(g) Statements ¶ 105; McLaughlin Ex. 5.)

There is no evidence presented to the Court that U.S. Trust specifically answered this letter; however, U.S. Trust specifically and directly declined to become involved in further defense of the action in subsequent letters. (Pl.'s & Def.'s 3(g) Statements ¶ 109; McLaughlin Exs. 12, 15, 17.)

On September 25, 1991, S & G advised Transtech that Equitable Tower was entitled under New York law to obtain, and now

---

1. There were two spaces—referred to as "old" and "new." AIM occupied the old space until October 30, 1985, but never occupied the new space. (Pl.'s & Def.'s 3(g) Statements ¶ 71; Fahey Dep. at 97.)

undoubtedly would seek, unpaid rent under the Lease for the entire ten-year term of the Lease. (Pl.'s & Def.'s 3(g) Statements ¶ 106; Adler Ex. 37.) S & G estimated Transtech's exposure under the Lease at approximately $1.8 million, depending on certain circumstances, and not including interest and attorneys' fees. (Pl.'s & Def.'s 3(g) Statements ¶ 107; Adler Ex. 37.) On December 23, 1991, Morton Portnoy, counsel for Equitable Tower, wrote to S & G stating that he "finally computed the amount due my client" at approximately $1.3 million. (Def.'s 3(g) Statement, Vol. II, Portnoy Exs.) Transtech wrote U.S. Trust an additional letter, dated February 12, 1992, stating, "[a]s reflected in my letter of October 2, 1990, the above referenced case has once again been resurrected by the plaintiff. The plaintiff has now indicated that it is seeking damages in excess of 1.3 million dollars." (McLaughlin Ex. 10; Def.'s 3(g) Statement ¶ 108.) Portnoy then changed that calculation once again on March 31, 1992, the same day the action was restored to the calendar. (Portnoy Ex. 20.)

Transtech entered into a $600,000.00 settlement with Equitable Tower to cover the Equitable Tower Lawsuit and all claims under the Lease, including Equitable Tower's claim for damages for the balance of the Lease.[2] (Pl.'s & Def.'s 3(g) Statements ¶ 116; Adler Dep. at 177–78; Adler Exs. 42–43.) U.S. Trust was advised of the settlement prior to its acceptance and refused to participate. (Pl.'s & Def.'s 3(g) Statements ¶¶ 113–14.)

After the settlement, Transtech demanded that U.S. Trust indemnify Transtech for losses arising from undisclosed liabilities relating to the Equitable Tower Lawsuit and the Lease. (Pl.'s & Def.'s 3(g) Statement ¶ 118.) U.S. Trust refused Plaintiff's demand for indemnification and the present action ensued. (Pl.'s & Def.'s 3(g) Statements ¶ 119; Third–Party Def.'s 3(g) Statement ¶ 29.)

Equitable Tower did not assert a claim against AIM for rent for the period November 1985 through the balance of the Lease term, until 1989. (Third–Party Def.'s 3(g)

Statement ¶ 5.) However, U.S. Trust alleges that S & G were aware of the possibility of such a claim beginning in June 1985, when S & G were first retained to handle the Equitable Tower Lawsuit and knew of the nature of the lawsuit. (Adler Dep. at 14; Fahey Dep. at 67–68, 89–90, 98–100.)

### B. The December 22, 1988 Stock Purchase Agreement

Section 2 of the Agreement between Transtech and U.S. Trust contained several representations and warranties made by U.S. Trust in connection with the AIM acquisition. (Pl.'s & Def.'s 3(g) Statements ¶ 15; Agmt. § 2.) In Section 2, U.S. Trust represented and warranted (i) that the financial statements, in Schedule 2.9, prepared by AIM's outside auditors, were "true, correct and complete in all material respects" (Agmt. § 2.9); (ii) that, apart from two identified leases, neither of which is the Lease, AIM had "no leases or other interests in real property" (Agmt. § 2.14); (iii) that there were no pending actions or proceedings, except as noted in Schedule 2.17, against AIM that did or might "materially adversely affect[ ] [AIM] ... or its assets, properties, or business" (Agmt. § 2.17(a)); (iv) that except as in Schedule 2.17(b), "to the best of [U.S. Trust's] knowledge, there [was] no reasonable basis for any as yet unasserted claim or action against [U.S. Trust] or [AIM] which might have a material adverse effect on AIM or its assets, properties, or business." (Agmt. § 2.17(b)); Pl.'s & Def.'s 3(g) Statements ¶¶ 17, 20–23.)

However, the Agreement specifically disclosed information on the Equitable Tower Lawsuit in Schedule 2.9 which contained the audited financial statements, and again in Schedule 2.17 which listed pending litigation that, if adversely determined, would not materially or adversely affect AIM. (Pl.'s & Def.'s 3(g) Statements ¶¶ 19, 23, 25; Agmt. §§ 2.9 & 2.17.) Both sections provide that the ultimate liability, if any, resulting from the Equitable Tower Lawsuit would not have

---

**2.** The trial judge in the Equitable Towers Lawsuit opined that a "fair settlement" of Equitable Tower's claims would be "in the neighborhood of $1

million;" both in-house counsel and S & G counseled settlement. (Pl.'s 3(g) Statement ¶¶ 110–12; Adler Ex. 42.)

a material effect on AIM's financial position. (Agreement § 2; Agreement Schedule 2.17.)

### 1. *Indemnification Clauses*

The 1988 Agreement also contained indemnification clauses which provided that U.S. Trust agreed to indemnify, defend, and hold Transtech harmless against any liabilities, losses, or damages incurred or suffered by AIM or Transtech arising from any breach of U.S. Trust's representations and warranties, and/or from any claim, by or on behalf of a third-party, against AIM, related to AIM prior to the Closing Date, except to the extent such claims were disclosed in the Agreement. (Pl.'s & Def.'s 3(g) Statements ¶¶ 39–40; Agmt. § 9.2.)

The indemnification provisions preserved U.S. Trust's right to jointly participate or take over the defense of any such claim for which Transtech claimed indemnification. (Pl.'s & Def.'s 3(g) Statements ¶ 43; Agmt. § 9.3.)

### C. S & G's Legal Representation of AIM

S & G represented AIM in connection with the Equitable Tower Lawsuit, beginning approximately in August 1985. (Third–Party Def.'s 3(g) Statement ¶¶ 3–4; Adler Dep. at 9.) S & G ceased representing AIM in approximately July 1992. (Third–Party Def.'s 3(g) Statement ¶ 27.) S & G recommended the 1992 settlement between Transtech and Equitable Tower. (Adler Exs. 42–43; Adler Dep. at 177–78.)

AIM's annual audited financial statements for the periods December 31, 1983, through December 31, 1984, were prepared as of June 4, 1985. (Third–Party Def.'s 3(g) Statement ¶ 6.) Note "L"[3] of those statements refer to AIM's having conferred with "special counsel" in the determination that the ultimate

liability of AIM in connection with the Equitable Tower Lawsuit would not have a material effect on the financial condition of AIM. U.S. Trust alleges the term "special counsel" refers to S & G,[4] who were retained by Choate, Hall & Stewart, AIM's regular counsel, for the sole purpose of handling the Equitable Tower Lawsuit. (Def.'s 3(g) Counter Statement to S & G ¶ 6.)

S & G sent AIM's auditors, Coopers & Lybrand, a letter dated August 7, 1985, in which S & G stated:

> "We call your attention to the fact that this firm has during the past year, represented the Company only in connection with certain litigation and has not been engaged for any other purpose.
>
> Subject to the foregoing and to the last paragraph of this letter ... we have not been engaged to give substantive attention to, or represent the Company in connection with, loss contingencies coming within the scope of clause (a) of Paragraph 5 of the Statement of Policy referred to in the last paragraph of this letter, except as follows ...,"

at which time the letter discussed the Equitable Tower Lawsuit. Next, the letter states, "[w]e have not formed a professional conclusion that in the proceeding described above an adverse outcome is either probable or remote, as such terms are defined in the ABA Statement of Policy." Finally, the letter goes on to state that S & G recognize they have a professional responsibility to advise AIM of any unasserted possible claims but the letter does not mention any unasserted possible claims. (Def.'s 3(g) Counter Statement to S & G ¶ 11; Third–Party Def.'s 3(g) Statement ¶ 11 & Ex. F.)

By letter dated January 22, 1986, AIM requested that S & G provide its auditors,

---

3. Note "L" states in material part:
 On June 4, 1985, a suit was filed against the Company which seeks approximately $76,000 in payment of alleged past due rent on leased property which the Company has never occupied in New York City. Company management believes after conferring with special counsel that the ultimate liability, if any, resulting from this litigation will not have a material effect on the consolidated financial position of the Company.

4. S & G claim that they represented neither U.S. Trust nor AIM in connection with U.S. Trust's 1986 Acquisition of AIM from Wolfensohn Associates L.P. Rather, they contend U.S. Trust was represented by the law firm Curtis Mallet–Prevost Colt & Mosle ("Curtis Mallet"). (Third–Party Def.'s 3(g) Statement ¶¶ 15–16; Adler Dep. at 110–11, 118–19.)

Coopers & Lybrand, with an audit inquiry response. (Third–Party Def.'s 3(g) Statement ¶ 12.) In that letter, AIM conveyed to S & G that: (i) AIM had informed its auditors that there were no undisclosed, unasserted, possible claims requiring disclosure; and (ii) AIM understood that if there were any such claims, S & G would so advise AIM as a matter of professional responsibility. (Def.'s 3(g) Counter Statement to S & G ¶ 12; Third–Party Def.'s 3(g) Statement ¶ 12 & Ex. G.)

In response to AIM's letter of January 22, 1986, S & G sent AIM's auditors, Coopers & Lybrand, a letter dated February 24, 1986, which was substantially identical to Exhibit F of the Third–Party Defendant's 3(g) Statement, despite Fahey's reference to "no unasserted possible claims or assessments." (Def.'s 3(g) Counter Statement to S & G ¶ 13; Third–Party Def.'s 3(g) Statement Ex. H.) On July 11, 1986, S & G reaffirmed the information set forth in its February 24, 1986 letter to AIM's auditors and stated that there had been no changes. (Def.'s 3(g) Counter Statement to S & G ¶ 13(b), Ex. D.) U.S. Trust relies on these letters to show that S & G never informed them of any possible unasserted claims.

Transtech and S & G now move for summary judgment.

## II. DISCUSSION

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment,

... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO*, 933 F.2d 187, 191 (2d Cir.1991); *see also Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

### A. Transtech's Motion for Partial Summary Judgment

Transtech moves for summary judgment only on the issue of indemnification.[5]

#### 1. *U.S. Trust's Duty to Indemnify*

Sections 9.1 and 9.2 clearly set out a duty to indemnify for any breach of warranty made in the Agreement. U.S. Trust argues that the Court must analyze the language in the Agreement to ensure that an intent to indemnify exists in the Agreement. The Court finds that the language is crystal clear as to U.S. Trust's intent to indemnify Transtech for claims not disclosed in the Agreement.[6]

---

**5.** Counts three and four allege fraud and fraudulent concealment respectively.

**6.** "[U.S. Trust] agrees to indemnify, defend, and hold harmless [Transtech] and any parent, subsidiary (including [AIM] ), and affiliate of [Transtech] ... from and against any and all liabilities, losses damages and reasonable attorney's fees, court costs, and other out-of-pocket expenses in-

curred or suffered by [Transtech] ... to the extent that the losses arise by reason of, or result from (a) a breach of any representation or warranty of [U.S. Trust] contained in or made pursuant to this Agreement or any facts or circumstances constituting such a breach...." Agmt. § 9.2.

### 2. U.S. Trust's Warranties

The issue for the Court is whether U.S. Trust breached any of its warranties. Although Plaintiff alleges several breaches of warranty, the Court will focus on two of the alleged breaches contained in Section 2.17 of the 1988 Agreement, because only one breach of warranty is necessary to sustain a claim for indemnification.

Section 2.17, entitled "Litigation," states, [e]xcept as set forth in Schedule 2.17: (a) there are no actions, suits, proceedings ... pending, or, to the best of [U.S. Trust's] knowledge, threatened, in law or in equity ... which materially adversely affects or may materially adversely affect [AIM] ... (b) to the best of [U.S. Trust's] knowledge, there is no reasonable basis for any as yet unasserted claim or action against [U.S. Trust] or [AIM] which might have a material adverse effect on [AIM] or its assets.... None of the items set forth in Schedule 2.17 other than Item 6 of said Schedule, individually or in the aggregate, if adversely determined, would materially and adversely affect [AIM].... [7]

The Court must decide, first, whether the language in Section 2.17 put Transtech on sufficient notice of pending litigation and, second, whether U.S. Trust had a reasonable basis for knowledge of any possible unasserted claims. If the language of Section 2.17 is insufficient, then U.S. Trust breached its warranties and has a duty to indemnify Transtech; if the language is sufficient, then there is no duty to indemnify.

Schedule 2.17(1) addresses the Equitable Tower Lawsuit. The paragraph explains that AIM won the Lawsuit below and that Equitable Tower appealed the decision. The warranty that "ultimate liability, if any, resulting from this litigation will not have a material effect on the consolidated financial position of" AIM has clearly been breached.

Although U.S. Trust notified Transtech of the lawsuit and the appeal, they did not notify Transtech of the extent of the possible liability. The quoted $76,000.00 figure was insufficient. A stipulation was entered into by AIM and Equitable Tower at the 1985 trial, agreeing to amend Equitable Tower's petition to allow a claim of rent in the amount of $188,053.95. The Stipulation also provided new amounts for use and occupancy. This number would be a more accurate statement of liability than $76,000.00. That alone is a breach of a warranty.

Furthermore, U.S. Trust warranted that they had no reasonable basis to know about any possible unasserted claims. However, the Lease provided that AIM would be liable for damages, including any and all unpaid rent. (Lease ¶¶ 18–19.) In New York such a clause is enforceable. In addition, there is no duty to mitigate damages in a commercial lease. *Holy Properties Ltd. v. Kenneth Cole Prods., Inc.*, 87 N.Y.2d 130, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995); *11 Park Place Assocs. v. Barnes*, 202 A.D.2d 292, 608 N.Y.S.2d 664, 665 N.Y.App.Div. 1st Dep't 1994); *Sage Realty Corp. v. Kenbee Mgmt–N.Y., Inc.*, 182 A.D.2d 480, 582 N.Y.S.2d 182, 183 (N.Y.App. Div. 1st Dep't 1992); *Syndicate Bldg. Corp. v. Lorber*, 128 A.D.2d 381, 512 N.Y.S.2d 674, 675 (N.Y.App.Div. 1st Dep't 1987). AIM could be liable for the entire term of the ten-year-lease, an amount of approximately $1,881,567.33.[8] Hence, AIM and U.S. Trust did have a reasonable basis to know about an unasserted claim.

U.S. Trust claims, however, that it knew neither of the Stipulation or the potential liability of almost two million dollars. U.S. Trust argues that there is a "knowledge" requirement in the Agreement, and therefore, it was not required to disclose anything it did not know. Indeed, the Agreement states "to the best of U.S. Trust's knowledge."[9] But U.S. Trust's agent, Sandra Fa-

---

7. Schedule 2.17 entitled "Litigation" reads,
 1. Equitable Tower Associates
 On June 4, 1985, a suit was filed against [AIM] by Equitable Tower Associates seeking approximately $76,000....

8. However, Equitable Tower did re-let the premises for a lower monthly rate. Thus, not including any escalation under the lease or attorneys'

fees, the potential liability was $1,005,778.67. (Pl.'s Mem.Law at 7.)

9. The proviso "to the best of [U.S. Trust's] knowledge" appears in Section 2.17, not in the indemnity section. Section 9.2(a) indemnifies Transtech for breach of warranties. Section 9.2(c) indemnifies for any claims not found in Section 2.17. Hence, the phrase "to the best if U.S.

hey,[10] CFO of AIM from 1984 through 1988, was aware of these facts and therefore that knowledge is imputed to U.S. Trust. *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985); *Farr v. Newman,* 14 N.Y.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964).[11] Furthermore, any lack of knowledge cited by U.S. Trust (*see* Def.'s Mem. Law at 8) was the fault of U.S. Trust. AIM, which U.S. Trust owned, entered the Lease. AIM knew about the Lease. From the terms of the Lease, AIM knew it was liable for the entire Lease. Furthermore, AIM entered the Stipulation with Equitable Trust. As between U.S. Trust and Transtech, U.S. Trust had access to the documents[12] and should have known about the Stipulation and the terms of the Lease. Hence, the Court finds that U.S. Trust breached its warranties in Section 2.17 and Schedule 2.17.

### 3. *Prompt Notice*

▪ However, U.S. Trust argues that, pursuant to the Agreement, Transtech had to provide "prompt notice" of any claims upon which it would seek indemnification.[13] U.S. Trust alleges Transtech failed to do so and therefore, Transtech's right to indemnity fails. However, in its Answer, ¶ 16, U.S. Trust admits that Transtech complied with all its duties under the Agreement and it is bound by that admission. Fed.R.Civ.P. 9(c).

Even if the admission in the Answer is insufficient, Transtech initially notified U.S. Trust on October 2, 1990 (McLaughlin Ex. 5), when the reversal of the appeal was final and reargument and leave to appeal had been denied. The issue is—was this notice prompt. The language in the Agreement does not mandate a specific time constituting reasonableness, but merely states twenty days will always be reasonable. As drafted, this provision invites interpretation of prompt notice as dependent on the circumstances. Furthermore, Section 9.3 is intended to protect U.S. Trust's right to defend. Hence, prompt notice is notice that gives U.S. Trust sufficient time to participate in the defense. Under all the circumstances, U.S. Trust had sufficient notice in order to prepare and contribute to any defense; it declined to do so.

The appeal was denied on October 12, 1989. It is unclear when leave to reargue and leave to appeal the Appellate Term's decision were denied. Arguably, the facts that would require pursuit of indemnity did not arise until the appeal process was completed, on the date reargument was denied, and Equitable Tower notified Transtech of its decision to go forward. Transtech notified U.S. Trust on October 2, 1990, a short time after leave to appeal and reargue was denied.

Trust's knowledge" does not apply to the indemnification section and any claim, whether in U.S. Trust's knowledge, is to be indemnified pursuant to 9.2(c). Here, U.S. Trust is liable for indemnification, as stated above, under 9.2(a) and 9.2(c).

**10.** Howard Adler, a lawyer at S & G who represented AIM, testified that Fahey worked with him on the Stipulation entered into between AIM and Equitable Tower and that he told her AIM could be liable for the whole lease. (Adler Dep. at 52 & Adler Ex. 6.) Sandra Fahey testified she was involved in the trial and that nothing was ever signed on behalf of AIM without her knowledge. (Fahey Dep. at 87–88.) Hence, she knew about the Stipulation. Furthermore, she testified that she was aware that AIM could be liable for the rent under the whole lease. (Fahey Dep. at 21, 68; Adler Dep. at 14, 37.)

**11.** "It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have

been communicated to the principal." *Farr,* 14 N.Y.2d at 187, 250 N.Y.S.2d at 275, 199 N.E.2d at 371. Furthermore, the principal is also imputed with knowledge that could have been acquired with reasonable inquiry. *Farr v. Newman,* 18 A.D.2d 54, 238 N.Y.S.2d 204, 208 (N.Y.App.Div. 4th Dep't 1963), *aff'd,* 14 N.Y.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (N.Y. 1964).

**12.** Fahey Dep. at 223.

**13.** Section 9.3 reads, in pertinent part, "[t]he Indemnified Party shall promptly notify the Seller of any fact upon which such Indemnified Party intends to base a claim for indemnification hereunder; provided, however, that it shall in all events be considered prompt notification if such notice shall be given (a) no later than 20 days after the Indemnified Party learns of the facts upon which it will claim such indemnification or (b) if earlier, in sufficient time to allow the Seller to exercise its rights pursuant to this Section 9.3."

The cases cited by U.S. Trust are distinguishable. For example, in *EMI Catalogue Partnership v. CBS/FOX Co.*, No. 81 Civ. 1149, 1994 WL 163700 (S.D.N.Y. Apr. 28, 1994), the court found that the notice was not prompt because the damages accrued as time passed, increasing any potential claim—over two years passed before initial notice was given, and the indemnifier was not given the chance to defend the claim.

U.S. Trust further argues that additional notice was required regarding the claim of indemnity for the entire rental period.[14] The Court finds however that this is an illusory requirement grafted on by U.S. Trust. Transtech informed U.S. Trust, by the latest, in September 1991, that the amount for the entire lease would be sought. However, this was simply an update of the October 1990 letter. Only the October 1990 letter was necessary to give prompt notice.

### 4. *Damages*

 U.S. Trust was notified it had a duty to defend. It chose not to. Hence, it is bound by the settlement reached by Transtech. *Carey Transp., Inc. v. Greyhound Corp.*, 80 B.R. 646, 652 (S.D.N.Y.1987) (if indemnitee is given opportunity to defend and notice, then indemnitor can settle and need only show potential liability); *Taylor Woodrow plc v. Blitman*, 603 F.Supp. 1152, 1154 (S.D.N.Y.1985) (must show that the settlement was reasonable); *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 187 N.Y.S.2d 116, 121 (N.Y.App.Div. 1st Dep't 1959).[15] Transtech settled for $600,000.00. In light of the potential liability of over one million dollars, a $600,000.00 settlement was reasonable.

The attorneys' fees, for which U.S. Trust is liable, pursuant to Section 9.2 of the Agreement, are $17,572.42, which brings the total to $617,572.42. Section 9.4 provides that a lesser amount of indemnity may be owed depending on the year U.S. Trust was notified. Notice was given in 1990, hence, $100,000.00 is to be deducted from the amount to be indemnified. The total is then $517,572.42. Furthermore, Transtech was on notice that the Equitable Tower Lawsuit could result in damages of up to $76,000.00. This is an amount that was therefore considered in determining the price of the sale of the AIM stock and an amount for which Transtech would be unable to seek indemnity. That amount shall be subtracted as well, leaving a total of $441,572.42. Hence, the Court finds that U.S. Trust must indemnify Transtech in the amount of $441,572.42, plus 9% interest. N.Y.Civ.Prac.L. & R. §§ 5001(a), 5004.

### B. S & G's Motion for Summary Judgment

U.S. Trust seeks to hold S & G liable if U.S. Trust is found, as it has been, liable to Transtech. U.S. Trust bases this claim on the belief that it was entitled to and did rely on the information provided by S & G when drafting Schedule 2.17 of the Agreement. S

---

14. Transtech claims that only in September 1991, did S & G advise Transtech that Equitable Tower was entitled to ten years of unpaid rent and it undoubtedly would seek it. (Pl.'s 3(g) Statement ¶ 106; Adler Ex. 37.) U.S. Trust claims that S & G told Transtech in October or November 1989. (Def.'s 3(g) Statement ¶ 106.) Putting aside the fact that U.S. Trust should have known about this claim by looking at the face of the Lease, the deposition portions cited by U.S. Trust indicate that Howard Adler, of S & G, told Anastasia McLaughlin, of U.S. Trust, that if the appeal was upheld they could be liable "for the term of the lease." (Adler Dep. at 120.) Mr. Adler further testified that he had already informed Charles Mattingly, counsel to Transtech, of the same information, but Mr. Adler could not recall whether he made these disclosures before or after the reargument. (Adler Dep. at 120.) Hence, U.S. Trust is unable to support its contention.

S & G advised Transtech by letter on September 25, 1991, with hard numbers, of the potential damages. (Adler Ex. 37.) On February 12, 1992, Transtech wrote an additional letter stating, "As reflected in my letter of October 2, 1990, the above referenced case has once again been resurrected by the plaintiff. The plaintiff has now indicated that it is seeking damages in excess of 1.3 million dollars." (McLaughlin Ex. 10.) Morton Portnoy, counsel for Equitable Tower, only wrote to S & G on December 23, 1991, stating that he "finally computed the amount due my client" at approximately 1.3 million. Even then Portnoy changed that calculation on March 31, 1992, the same day the action was restored to the calendar. (Portnoy Ex. 20.)

15. Transtech did notify U.S. Trust and they have shown the potential for liability by stating the law on mitigation of damages, and providing the Lease which requires AIM to pay damages.

& G argue that they had no duty to provide that information to U.S. Trust and the information they did provide AIM cannot be relied upon for inclusion in an acquisition agreement.

First S & G argue that U.S. Trust's claim against them fails because, "if none of the allegations of a complaint can be construed as charging defendant with liability without actual fault, defendant may not seek recovery over from a third-party." *In re Petrie's Estate*, 36 A.D.2d 889, 320 N.Y.S.2d 117, 119 (N.Y.App.Div. 4th Dep't 1971); *see Jakobleff v. Cerrato, Sweeney and Cohn*, 97 A.D.2d 786, 468 N.Y.S.2d 894, 895 (N.Y.App.Div.2d Dep't 1983). Therefore, if Transtech's Complaint precludes the liability of U.S. Trust for indemnification based on negligence, U.S. Trust has no claim for indemnification against S & G. However, under the indemnification counts of the Complaint, it can be construed that if U.S. Trust was negligent in providing information in the Agreement then it would still be liable for indemnification. Hence, the Complaint does have room for a negligence cause of action, and U.S. Trust may assert an indemnification claim against S & G.

■ Next, the Court looks to whether U.S. Trust can sustain a claim for indemnity. Indemnification is a cause of action which allows the party who is held legally liable to shift the entire loss to another, as opposed to contribution where two or more parties share the loss. *United States v. Farr & Co.*, 342 F.2d 383, 386 (2d Cir.1965); *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 24, 494 N.Y.S.2d 851, 853, 484 N.E.2d 1354, 1356 (N.Y.1985). Indemnity can arise in two separate ways—one, through an express contract, or two, through an implied contract. Here, there was no express contract between U.S. Trust and S & G, therefore U.S. Trust must proceed, if at all, under an implied contract theory.

■ Implied indemnity arises in two situations. First, indemnity may be found pursuant to the "implied contract" or "implied in fact" theory where there is a special contractual relationship supporting a finding of indemnity. *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir.1986) (citing *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956)). Second, an "implied in law" theory of indemnity, where one is vicariously liable for the tort of another because one of the tortfeasors was primarily liable for the tort. *Id.* "Generally, a right of implied indemnification will arise in favor of one who is compelled to pay for another's wrong." *Taft v. Shaffer Trucking, Inc.*, 52 A.D.2d 255, 383 N.Y.S.2d 744, 745 (N.Y.App.Div. 4th Dep't 1976) (citing *Margolin v. New York Life Ins. Co.*, 32 N.Y.2d 149, 152, 344 N.Y.S.2d 336, 338, 297 N.E.2d 80, 82 (N.Y.1973)). Furthermore, under this theory U.S. Trust must show that S & G breached a duty to Transtech. *Yemen*, 782 F.2d at 351; *Kemron Envtl. Servs. v. Environmental Compliance, Inc.*, 184 A.D.2d 755, 585 N.Y.S.2d 475, 476 (N.Y.App.Div.2d Dep't 1992); *Rosado*, 66 N.Y.2d at 24, 494 N.Y.S.2d at 853, 484 N.E.2d at 1355.

■ In addition, a party cannot seek indemnity if they were partially at fault. *Monaghan v. SZS 33 Assocs., L.P.*, 73 F.3d 1276, 1284 (2d Cir.1996) ("common-law indemnity is barred altogether where the party seeking indemnification was itself at fault"); *Orsini v. Kugel*, 9 F.3d 1042, 1049 (2d Cir.1993) ("Indemnification is not available to a party who 'was himself partially at fault.'" (citations omitted)); *Rosado*, 66 N.Y.2d at 24, 494 N.Y.S.2d at 853, 484 N.E.2d at 1355 ("must show that it may not be held responsible in any degree"); *County of Westchester v. Welton Becket Assocs.*, 102 A.D.2d 34, 478 N.Y.S.2d 305, 314 (N.Y.App.Div.2d Dep't 1984), *aff'd*, 66 N.Y.2d 642, 495 N.Y.S.2d 364, 485 N.E.2d 1029 (1985).

■ The Court must first find a contract, whether implied or express, between U.S. Trust and S & G. The only possible theory U.S. Trust can proceed under is that it had a special relationship with S & G, under an implied in fact theory. U.S. Trust cannot proceed under the implied in law theory for two reasons. One, U.S. Trust has failed to advance any grounds, and the Court cannot conceive of any, in which S & G can be said to owe a duty to Transtech. Second, any

analogy to vicarious liability, which this indemnity theory involves, is flawed, under the circumstances presented here. *See Rosado,* 66 N.Y.2d at 26, 494 N.Y.S.2d at 854, 484 N.E.2d at 1356.

U.S. Trust argues that S & G were the "special counsel" to AIM in the 1986 Acquisition of AIM from Wolfensohn. S & G respond that U.S. Trust and AIM were represented by several other law firms during the acquisition. But U.S. Trust denies this assertion, arguing instead that, although Curtis Mallet were the corporate lawyers handling the deal for U.S. Trust, and Choate Hall & Stewart were the corporate lawyers handling the deal for AIM, S & G were involved in the process through the information they provided to AIM. (Fahey Dep. at 141–42; 259; 262–65; 304.)

Similarly, S & G contend that they represented neither U.S. Trust nor AIM in connection with the 1988 Agreement, and that those companies were represented by the law firm of Ropes & Gray. (Third–Party Def.'s 3(g) Statement ¶ 19.) Again, U.S. Trust denies this claim and insists that, although Ropes & Gray were the corporate lawyers handling the deal, S & G approved the language of Schedule 2.17 upon which it relied in making the seller's warranties and representations on the sale, through the information S & G provided Coopers & Lybrand, which information Coopers used to draft part of the 1988 Agreement. (Def.'s 3(g) Statement ¶¶ 15–16, 18.) Furthermore, U.S. Trust claims Ms. Fahey had several discussions with Howard Adler of S & G, regarding the sale and the appropriate language to be used in the Agreement. (Def.'s 3(g) Statement ¶¶ 19, 22; Fahey Dep. at 169–71.)

S & G contend that at no time prior to December 22, 1988, did AIM or U.S. Trust inform them that: (1) U.S. Trust owned AIM, (2) U.S. Trust intended to sell AIM to Transtech, or (3) U.S. Trust intended to make certain representations regarding the Equitable Tower Lawsuit to Transtech in connection with the Agreement. (Third–Party Def.'s 3(g) Statement ¶ 22; Adler Dep. at 110–11, 118–19, 122, 232.)

Moreover, S & G claim that at no time prior to December 22, 1988, did AIM or U.S. Trust consult S & G regarding the accuracy of any of the representations set forth in the Agreement. (Third–Party Def.'s 3(g) Statement ¶ 23; Adler Dep. at 122, 232; Fahey Dep. at 285–87.) S & G also insist they were not the source of the representations regarding the Equitable Tower Lawsuit made by U.S. Trust in the 1988 Acquisition Agreement, and did not approve the representations made by U.S. Trust in that Agreement. (Third–Party Def.'s 3(g) Statement ¶¶ 24, 25; Adler Dep. at 122, 164, 232.)

U.S. Trust denies these assertions and refers the Court to the letters written by S & G to Coppers & Lybrand as well as ambiguous testimony by Fahey. (Def.'s 3(g) Counter Statement to S & G ¶¶ 13(a), 13(b), 22–24.) U.S. Trust insists that S & G were, in fact, informed by AIM that it was preparing a schedule in connection with the 1986 acquisition of AIM and approved the language of the text. (Def.'s 3(g) Counter Statement to S & G ¶ 22.) Furthermore, U.S. Trust contends that had it been so advised by S & G, it would have disclosed any potential seven-figure Equitable Tower claim or existing exposure in the schedules describing the litigation in both the 1986 and 1988 contracts. (Def.'s 3(g) Counter Statement to S & G ¶ 22(c); Fahey Dep. 223–26.)

However, the documents, depositions and pleadings do not set forth support for any conceivable liability by S & G to U.S. Trust. It is clear from the review of the transcript of AIM Vice President Sandra Fahey that she took the "head in the sand" approach to AIM's liability on the Equitable Tower Lease. (Fahey Dep. at 67–68, 137–38.) The Lease dated May 30, 1984, on its face sets forth potential liability of AIM for any violations of the Lease. (Lease ¶ 18, "Remedies of Landlord and Waiver of Redemption;" ¶ 19 Fees and Expenses.)

Further, it is quite clear that, despite the vague allegation that Fahey told Adler of S & G that AIM was being purchased, this is not supported by her own testimony,[16] and it

---

16. *See* Fahey Dep. at 141–44, 146–50, 169–74, 227–30, 285–90. At page 232 Fahey states, "I

don't have a specific recollection about most of the conversations and happenings here. I'm fol-

is consistently and unequivocally denied by Howard Adler. Adler Dep. at 110–11, 118–19, 122, 232. Furthermore, the allegation is totally unsupported by any of the documents submitted by the parties. It appears, that for whatever reason, Ms. Fahey was attempting to solicit information pertinent to acquisitions from S & G without telling them the dual purpose she intended for the information supplied to the auditors allegedly for annual financial statements.[17] (Fahey Dep. at 133–49, 168–73.)

Furthermore, Ms. Fahey testifies that she was present during the August 1985 trial, even though she does not recall anything that happened, and claims no understanding of the Stipulation and calculations made therein. (Fahey Dep. at 82–87.) On the other hand, Fahey acknowledges that as of October 1985, her "impression" was that the landlord in the Equitable Tower litigation was not cancelling any claim that he might have, based on a letter to her on October 28, 1985, saying that the landlord "does not accept the surrender of such premises as effective under the lease obligations...." (Fahey Dep. at 98–100.) While Fahey alleges that she did not understand or did not recall the significance of the August 1985 trial Stipulation, or the calculations that she must have participated in to obtain numbers for that Stipulation, it is inconceivable particularly in light of the Lease itself and her testimony about Adler consulting with her through the trial, (Fahey Dep. at 82–88; Adler Dep. 74–77), that AIM itself was not aware of its potential liability under the Lease well in advance of its acquisition by either U.S. Trust or Transtech.

Further, no documents support the contention that S & G were aware of the acquisition of AIM by either U.S. Trust or Transtech until Equitable Towers asserted its demand for the balance of the Lease. Nor do they support a finding that S & G and U.S. Trust had a special relationship sufficient to support a finding for implied indemnity.

Finally, U.S. Trust has only itself to blame for the information provided in the Agreement. Even assuming S & G had a duty to provide U.S. Trust certain information and that U.S. Trust could rely of the information provided to Coopers & Lybrand, neither which is the case here, U.S. Trust did not change the information in the Agreement to conform to the information in the letters.[18]

U.S. Trust has failed to advance any legal argument that would support an indemnity claim against S & G.[19] On the credible evidence before the Court, there is no basis for a claim by U.S. Trust against S & G for either indemnification or subrogation. S & G's Motion for Summary Judgment is granted.

## III. CONCLUSION

Transtech's motion seeking indemnification from the Defendant, U.S. Trust, is hereby GRANTED in the amount of $441,572.42 plus 9% interest. Hence, only Plaintiff's Counts three and four of the Complaint remain.

---

lowing my—what I know I did as a procedure." At page 297 the question is, "Do you recall Howard Adler approving the disclosure language [of Schedule 2.17] in that conversation," to which Fahey responds "I don't recall." When it comes down to it Fahey admits she cannot recall much of the substance of her telephone conversations with Adler. Fahey Dep. at 297–98.

**17.** The letters state that they are written pursuant to the "ABA Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information." Section 7 of the Policy Statement specifically says that the information provided under this Statement, "[u]nless otherwise stated in the lawyer's response, it shall be solely for the auditor's information in connection with his audit or the financial condition of the client...."

**18.** The Agreement refers to a claim of $76,000.00 and the letters refer to a claim in excess of $100,000.00. Furthermore, putting aside the liability for the entire rental term, the amount stipulated to by AIM's attorney prior to the Equitable Tower trial should have been reported as well; once again, it was not.

**19.** U.S. Trust spends a great deal of time and advances case law involving the duties of agent to its principal. However, at no time has the Court found that S & G were the agent of U.S. Trust. This conclusion is not necessary for the finding that U.S. Trust shall indemnify Transtech. Furthermore, assuming U.S. Trust properly pled this claim in the Complaint, no evidence has been advanced that would support a claim that S & G were U.S. Trust's agent.

Third–Party Defendant, S & G's motion is GRANTED.

SO ORDERED.