NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1807
_____

PREMIER PORK, L.L.C.,

Appellant
v.

WESTIN PACKAGED MEATS,
INC., f/k/a COOK COUNTY
COOKERS L.L.C.;
BRETT ELLIOT

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 07-cv-01661)
District Judge:  Honorable Joseph H. Rodriguez

_____

Submitted Under Third Circuit LAR 34.1(a)
January 6, 2011

Before:  AMBRO and FISHER, *Circuit Judges*, and SÁNCHEZ,[*] *District Judge*.

(Filed:  January 19, 2011)
_____

OPINION OF THE COURT
_____

SÁNCHEZ, *District Judge*.

This case stems from Appellant Premier Pork's (Premier) July 2006 delivery of five pork

belly shipments to Cook County Cookers (CCC), a meat products business that ceased operating

_____

[*]The Honorable Juan R. Sánchez, District Judge for the United States District Court for
the Eastern District of Pennsylvania, sitting by designation.

soon after receiving the shipments. CCC failed to pay for the shipments, and thereafter Premier, a New Jersey company, filed the underlying lawsuit to recover the $174,079.50 CCC owed from Westin Packaged Meats, Inc. (WPM), a Nebraska corporation that purchased certain CCC assets. Premier alleged WPM was liable for CCC's contractual breach as a successor-in-interest. Premier also claimed WPM President Brett Elliot was liable for common law fraud based on his alleged misrepresentation that he personally would pay CCC's debt to Premier. The case was tried to a jury and, at the close of Premier's case, the District Court granted WPM's and Elliot's motions for judgment as a matter of law on both claims. For the reasons stated below, we affirm the decision of the District Court.

I.

Because we write exclusively for the parties, who are familiar with the factual context and legal history of this case, we set forth only those facts necessary to our analysis.

CCC was a Chicago-based manufacturer of raw sliced bacon, pork chops, and corned beef, some of which were sold under the trade name Brookfield Farms. Between July 10, 2006, and July 21, 2006, Premier sent five pork belly shipments to CCC for use in its bacon processing business. The total cost for these shipments was $174,079.50. Although CCC received all five shipments, it never paid Premier.

On July 25, 2006, CCC's primary secured creditor, LaSalle National Bank (LaSalle), foreclosed on CCC's assets and held a public auction of them in Illinois pursuant to Uniform Commercial Code Article 9, effectively ending the business of CCC. Flint Hills Foods (Flint) was the highest bidder at the auction. On July 31, 2006, WPM paid Flint $500,000 for the right to purchase CCC's corned beef operations. The following day, WPM purchased LaSalle's

interest in CCC's corned beef business for $795,604.75, and acquired the right to use the Brookfield Farms trade name for its future sale of corned beef products.[1] Flint maintained ownership of assets related to CCC's raw bacon and pork chop operations. After Flint and WPM purchased CCC's pork and corned beef product assets, respectively, they endeavored to continue selling to CCC's former customers. To that end, Flint and WPM worked together for a three to four month transition period, during which WPM assisted Flint with its pork products business in order to protect their common customer base and ensure CCC's customers would order corned beef products from WPM. (App. 179.) WPM assisted Flint by purchasing pork bellies from Premier in September 2006, which allowed Flint to transition the pork products business from CCC's Chicago plant to its plant in Iowa.[2] (App. 218.) Once the transition period ended in November 2006, WPM ceased all involvement in Flint's pork products business and made no further pork belly purchases. (App. 219.)

In April 2007, Premier commenced this action in the District of New Jersey. A trial was held in February 2010, and at the close of Premier's case Defendants made a motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50, arguing there was insufficient evidence to impose successor liability on WPM and the fraud claim against Elliot

---

[1] Elliot testified the Brookfield Farms trade name was previously used for CCC's corned beef products and was never used for CCC's raw bacon products. (App. 215 ("The raw sliced bacon wasn't sold under the Brookfield brand, they primarily manufactured that as a private label.").)

[2] Premier concedes WPM paid for the September shipments. In fact, Premier's President, Herman Klayman, testified WPM overpaid for these shipments by more than $7,000. The reason for this overpayment is disputed by the parties. Klayman asserts Elliot authorized Premier to overcharge WPM to pay down CCC's debt to Premier (App. 225-26), while Elliot asserts such overpayments were to be applied to WPM's future orders. (App. 213.) As a result of Premier's retention of $7,000 in overpaid funds, Premier reduced its damages demand against WPM to $167,004.09.

3

was barred by the statute of frauds and by Premier's failure to prove reliance. The District Court orally granted the Defendants' Rule 50 motion and formalized dismissal of the case by Order of February 18, 2010. Premier timely filed the instant appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over an order granting judgment as a matter of law. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Such a motion should be granted only if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004) (citations omitted). In determining whether a claim should have been presented to a jury, "[t]he question is . . . whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc.*, 4 F.3d at 1166 (citation omitted).

## III.

Premier raises two issues on appeal, arguing that the District Court erred (1) in determining WPM did not have successor liability for CCC, and (2) in granting judgment as a matter of law on Premier's fraud claim against Elliot. We address each contention in turn.

## A.

Before analyzing the merits of the successor liability issue, we address Premier's contention that the District Court erred by applying Illinois law to this claim. Under New

Jersey's choice of law rules,[3] which require application of the law of the state with the greatest interest in a dispute, a court must first determine whether an actual conflict exists between the state laws at issue. *Gantes v. Kason Corp.*, 679 A.2d 106, 109 (N.J. 1996). If a conflict exists, a court must apply a flexible "governmental interest" analysis, "identify[ing] the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986).

In this case, the parties agree Illinois and New Jersey law regarding successor liability are sufficiently disparate to warrant a choice of law determination. Applying the governmental interest analysis, the District Court explained, "each of the facts that Premier Pork appears to rely upon to establish successor liability against [WPM] occurred in Illinois"—Premier and CCC's contract was formed in Illinois; CCC's creditor, LaSalle, was located in Illinois; the foreclosure auction occurred in Illinois; and WPM's purchases of certain CCC assets were conducted in Illinois. (App. 69.) In contrast, the only connection this case has to New Jersey is Premier's status as a New Jersey limited liability company with its principal place of business in the state. Beyond the case's overwhelmingly strong connection to Illinois, policy considerations also favor application of Illinois law because it is generally appropriate for the law of the state where a foreclosure sale occurs to govern such a sale, not the laws of the states in which creditors reside, because a state has a strong interest in ensuring debtors can dispose of their assets without being

---

[3] In a case based on diversity jurisdiction, a court must apply the forum state's choice of law rules to determine which state's law applies. *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008).

subject to the laws of multiple different states. Thus, the District Court correctly decided Illinois law should govern the issue of successor liability.

Having determined that the District Court properly applied Illinois law, we next address the merits of the District Court's determination that WPM was not liable for CCC's debt to Premier. In general, "a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997). There are four exceptions, however, to this general rule of non-liability. *Id.* A successor may be liable if: (1) there is an express or implied agreement that the buyer will assume the seller's liabilities; (2) the transaction is effectively a consolidation or merger of the buyer or seller corporation; (3) the buyer is merely a continuation of the seller; or (4) the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Id*. at 1175-76. At trial, Premier argued the first and third exceptions created successor liability for WPM.[4]

First, Premier asserted WPM should be liable because WPM expressly or implicitly promised to pay CCC's debts. In evaluating such a claim, a court's analysis is guided by the terms of the agreement between the two entities. *See Diguilio v. Goss Int'l Corp*., 906 N.E.2d 1268, 1277 (Ill. App. Ct. 2009) (analyzing an asset purchase agreement to determine whether the purchaser assumed the debts of the seller). Here, no evidence was introduced to show an agreement between Flint, CCC, and WPM, or between WPM and LaSalle, in which WPM

---

[4] Premier's brief does not make clear which theory it is still pursuing. Because it cites facts which, had they been proven at trial, would have supported theories of express or implied agreement and the "mere continuation" theory, we assume Premier is continuing to advance its original arguments on appeal.

6

agreed to be liable for CCC's debts, despite the District Court's admonishment to Premier to analyze the contracts created during WPM's acquisition of certain CCC assets. Furthermore, Klayman's testimony that Elliot promised WPM would pay the amounts due for CCC's outstanding invoices by allowing Premier to mark up the price of future pork belly shipments is insufficient to show an agreement because there is no evidence Elliot made this promise at a time when he was authorized to by WPM. Klayman could not specify when Elliot made this promise. The pork belly shipment invoices sent by Premier to WPM, which Klayman testified included an agreed-upon price increase, bear dates from September 11, 2006, to September 20, 2006. Thus, it appears that if Elliot did promise WPM would overpay on its pork belly purchases, such an agreement was made prior to October 2006. Elliot, however, was not hired as WPM's president until October 2006, and there is no evidence supporting Premier's assertion Elliot was authorized in September 2006 to act on behalf of WPM to incur liability for CCC's debt. *See Sacks v. Helene Curtis Indus., Inc.*, 91 N.E.2d 127, 131 (Ill. App. Ct. 1950) ("It is well settled that one dealing with an agent of a corporation has the burden of proving the agent's authority to bind the principal to the particular contract on which he rests his claim."). Thus, the District Court correctly held the evidence introduced at trial was insufficient to find WPM made an express or implied agreement to pay CCC's debts.

Premier's second argument for successor liability based on the "mere continuation" exception also fails. This exception applies "when the purchasing corporation is merely a continuation or reincarnation of the selling corporation." *Vernon*, 688 N.E.2d at 1176. "In other words, the purchasing corporation maintains the same or similar management and ownership but merely 'wears different clothes.'" *Id.* In order for this exception to apply under Illinois law,

7

there must be a common identity of officers, directors, and stock between the predecessor and the successor companies. *Id.* Premier introduced no evidence showing CCC and WPM shared the same stock, business operations, or location. Indeed, the evidence shows just the opposite— WPM moved the limited corned beef production assets it purchased from CCC to its Nebraska plant; WPM and Flint cooperated to transition CCC's raw pork operations to Flint; and WPM did not acquire any of CCC's equipment or assets beyond the Brookfield brand and the corned beef business. Given the dearth of evidence presented by Premier to prove its case, we find the District Court correctly granted judgment as a matter of law on the successor liability claim against WPM for CCC's breach of contract.

B.

Finally, we address the District Court's decision to grant judgment as a matter of law against Premier on its fraud claim against Elliot. The District Court ruled Premier's fraud claim was foreclosed by the New Jersey statute of frauds[5] because Premier could not produce a written document in which Elliot agreed to be liable for CCC's debt to Premier. (App. 271.)

Without addressing the statute of frauds, Premier argues in its brief that the District Court erred because Elliot misrepresented that he personally would pay CCC's debt to Premier if WPM failed to do so, and this promise "satisfies all of the well established elements of common law fraud." (Appellant's Br. 14.) Elliot argues the District Court properly granted judgment as a matter of law on Premier's fraud claim because the claim is barred by the statute of frauds and because Premier failed to show detrimental reliance on Elliot's alleged promise as a matter of law. Because we agree Premier failed to show it relied to its detriment on any promise by Elliot,

---

[5] The parties agree New Jersey law applies to Premier's claim against Elliot.

8

we need not address whether the statute of frauds also barred Premier's fraud claim.

To prevail on its fraud claim, Premier was required to prove: (1) a material misrepresentation by Elliot of a past or present fact; (2) Elliot's knowledge of the fact's falsity; (3) Elliot's intent that Premier rely on the statement; (4) reasonable reliance by Premier; and (5) resulting damages to it. *See Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1247 (N.J. 2006). Even if we assume Premier introduced sufficient evidence for the jury to consider whether Elliot promised to pay CCC's debt, Premier failed to put forth evidence that its reasonable reliance upon such a promise resulted in damages.

According to Klayman's testimony, Elliot did not promise to repay CCC's debt until after CCC went out of business (App. 156-57), by which time CCC had already incurred and failed to pay the debt.[6] Although Premier was damaged when its invoices for the July 2006 invoices were not paid, it sustained those damages before Elliot allegedly made his promise to pay, and the damages were thus not sustained in reliance on Elliot's promise. Klayman did testify he relied on Elliot's promise in agreeing to send additional pork bellies to WPM in September 2006. (App. 155.) However, it is undisputed that WPM overpaid Premier for all its orders (App. 118-19), and Premier thus suffered no damages as a result. Therefore, because "there is no legally sufficient evidentiary basis for a reasonable jury" to find for Premier on this count, *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 288 (3d Cir. 1993), we affirm the District Court's decision to grant judgment as a matter of law in Elliot's favor.

C.

---

[6] Payment on the five subject invoices was due between July 24, 2006, and August 4, 2006. (App. 45-9.)

Finally, WPM has asked us to impose sanctions against Premier for filing a frivolous appeal.[7] Federal Rule of Appellate Procedure 38 authorizes us to sanction an appellant who files a frivolous appeal by "award[ing] just damages and single or double costs to the appellee." Such damages are awarded in the case of a frivolous appeal "'as a matter of justice to the appellee and as a penalty against the appellant.'" *Hilmon Co. (V.I.) Inc. v. Hyatt Int'l*, 899 F.2d 250, 253 (3d Cir. 1990) (quoting Fed. R. App. P. 38 advisory committee's note). An appeal is frivolous if, applying an objective standard, it is wholly without merit. *Quiroga v. Hasbro, Inc*., 943 F.2d 346, 347 (3d Cir. 1991). In making this determination, a court may consider whether "the appeal was taken in bad faith with an intent to delay [or] harass, or [whether] the arguments of the appeal had no basis in law or were totally without merit." *In re Hall's Motor Transit Co.*, 889 F.2d 520, 523 (3d Cir. 1989). While this Court is cognizant of the burden to appellees that stems from the filing of frivolous appeals, we nonetheless exercise caution in classifying appeals as frivolous "so that novel theories will not be chilled and litigants advancing any claim or defense which has colorable support under existing law or reasonable extensions thereof will not be deterred." *Hilmon*, 899 F.2d at 253.

Although Premier's appeal is not meritorious, it is not so devoid of substance as to render Premier and its counsel liable for damages and costs under Rule 38. Premier advances colorable—although poorly briefed and ultimately unsuccessful—arguments for why WPM should face successor liability. Premier supports its arguments with documents it contends showed WPM continued CCC's bacon business and with testimony of Premier employees and

---

[7] Westin seeks sanctions under Federal Rule of Appellate Procedure 38, Federal Rule of Civil Procedure 11, and 28 U.S.C. § 1927. Because Westin's core argument is based on the frivolity of Premier's appeal, this motion is best analyzed under Rule 38.

officers. Given the existence of some evidentiary support for Premier's appeal, we decline to impose damages under Rule 38.

IV.

For the foregoing reasons, we will affirm the order of the District Court.